# Illinois Official Reports

## Appellate Court

---

### *People v. Stafford*, 2016 IL App (4th) 140309

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DAVID P. STAFFORD, Defendant-Appellant. |
| District & No. | Fourth District<br>Docket No. 4-14-0309 |
| Filed | September 1, 2016 |
| Decision Under Review | Appeal from the Circuit Court of Woodford County, No. 02-CF-26; the Hon. John B. Huschen, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Michael J. Pelletier, Jacqueline L. Bullard, and James Ryan Williams (argued), all of State Appellate Defender's Office, of Springfield, for appellant.<br><br>Gregory A. Minger, State's Attorney, of Eureka (Patrick Delfino and Allison Paige Brooks (argued), both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | PRESIDING JUSTICE KNECHT delivered the judgment of the court, with opinion.<br>Justices Turner and Harris concurred in the judgment and opinion. |

¶ 1    In August 2003, a jury found defendant, David P. Stafford, guilty of four counts of first degree murder (720 ILCS 5/9-1(a)(1), (2) (West 2002)) and one count of first degree felony murder (residential burglary) (720 ILCS 5/9-1(a)(3), 19-3(a) (West 2002)). The trial court sentenced defendant to natural life in prison (720 ILCS 5/9-1(b)(6)(a), (b), (c) (West 2002)). On appeal, defendant argued the trial court abused its discretion when it sentenced him to natural life in prison, and this court affirmed the trial court's judgment. *People v. Stafford*, No. 4-03-1011 (Feb. 23, 2006) (unpublished order under Supreme Court Rule 23).

¶ 2    In June 2013, defendant filed a *pro se* postconviction petition alleging his life sentence was unconstitutional under the United States Supreme Court's decision in *Miller v. Alabama*, 567 U.S. ___, 132 S. Ct. 2455 (2012), because he was 17 years old when the crime was committed and his life sentence violated the eighth amendment's ban on cruel and unusual punishment. U.S. Const., amend. VIII. The State moved to dismiss the petition because defendant received a discretionary life sentence, in contrast to the mandatory life sentence challenged in *Miller*. The trial court granted the State's motion, and this appeal followed.

¶ 3                                    I. BACKGROUND
¶ 4                                        A. Trial
¶ 5    The evidence presented at trial showed on March 6, 2002, Cherie Gillson was murdered in the bedroom of her Eureka, Illinois, home. The victim had at least 45 discrete stab wounds in multiple locations, including her face, arms, legs, and stomach. A doctor testified, based on several of the wounds, "severe" force had been used. The victim's nine-year-old son was asleep in the basement at the time of the killing. The victim's son found his mother later in the morning and called for help. On March 7, 2002, the victim's neighbors informed the police they found a blue leather jacket, stained with blood and with dark hair caught in the zipper, in their yard. Defendant's father later identified the jacket as belonging to defendant.

¶ 6    On March 17, 2002, the police recorded defendant's confessional statement. Defendant, then 17 years old, claimed he went into the victim's home to steal videotapes. Defendant stated he knew the victim, as she was a school bus monitor, and she had previously let him borrow videotapes. He thought he heard a sound coming from one of the bedrooms. He grabbed a knife from the victim's kitchen in case he was discovered. Defendant opened the door to the victim's room and stabbed her in the stomach when she walked toward the door. The victim hit defendant, which enraged him, and he continued to stab her. Defendant lay down next to the victim as she died. Defendant stated he held her and said, "Good-bye bitch." After he determined the victim was deceased, he went into the kitchen to wash his hands and proceeded to steal videotapes from her entertainment center. Defendant later said he did not know what he would have done if the victim's son had walked into the room. After defendant's confessional statement, the police conducted a search of his bedroom. The police found two videotapes, which matched the tapes defendant said he had taken from the victim's home. Defendant's fingerprints also matched the latent prints found on the victim's remaining videos.

¶ 7    The jury found defendant guilty of four counts of first degree murder (720 ILCS 5/9-1(a)(1), (a)(2) (West 2002)) (counts I, II, III, and IV) and one count of first degree felony murder (residential burglary) (720 ILCS 5/9-1(a)(3), 19-3(a) (West 2002)) (count V) for the

stabbing of Cherie Gillson.

¶ 8                                                  B. Sentencing

¶ 9         On October 6, 2003, the trial court held a sentencing hearing. Defendant's father testified regarding defendant's childhood. Defendant's parents divorced when he was two years old. His father was given custody, and defendant seldom heard from his mother. Defendant had a number of behavioral issues. For example, he was caught playing with his penis on a school bus and took a knife from home onto the school bus. Defendant showed signs of aggression toward women and "ha[d] a problem with their authority." Prior to sentencing, defendant's father wrote a letter to the trial court, expressing his love for his son but also his fear defendant would hurt more people if he were ever released into society again.

¶ 10        The presentence investigation report (PSI) demonstrated defendant had a troubled history. Defendant's highest level of education was the tenth grade. In 1993, when defendant was eight years old, a teacher reported defendant had social and emotional problems: he liked to play he was stabbing people, and he said when he grew up, he wanted to be a murderer. In 1997, when defendant was 12 years old, a teacher noted defendant spoke with great bravado regarding how he attacked a peer and sent him to the hospital, cut an adult with a beer bottle, and threatened another adult with a gun, and he threatened a female student with a knife. Defendant's school records also show he was suspended from school for fighting and on a separate occasion, he was suspended for assaulting a student and threatening a bus driver.

¶ 11        From ages 12 to 17, defendant was placed in approximately 13 facilities and shelters in Iowa, which he claimed was due to "anger and voices in [his] head." In May 1997, defendant was court-ordered to a shelter for sexually abusing his two younger brothers, ages 8 and 10. While at the shelter, he had numerous sexual issues; for example, he was fixated on sexual subjects, accused a roommate of sexually abusing him, and complained to staff he masturbated to the point of soreness. In June 1997, defendant was court-ordered to inpatient evaluation due to a strange discussion with his guardian *ad litem* referencing Satan. Defendant was diagnosed with conduct disorder and parent-child problems. The staff observed he had an inflated self-esteem, bragged about sexual conquests, and bragged about his knowledge of gangs.

¶ 12        In July 1997, defendant was placed in a psychiatric medical institute for children, where he was hospitalized for two weeks due to a major episode of aggression. In its evaluation, the institute noted defendant was of above average intelligence and diagnosed him with major depression, attention deficit/hyperactivity disorder, and conduct disorder (childhood onset type). He was consistently unable to comply with the rules, was caught in sexually inappropriate situations, was prone to stealing, and showed no remorse for sexually abusing his brothers. Defendant assaulted a female staff member, which ultimately led to his unsuccessful discharge.

¶ 13        In May 1998, he began a court-ordered perpetrators program. In October 1999, he was discharged, and it was the staff's opinion defendant would continue to commit sexual crimes against those whom he saw as weaker than him without close supervision. In February 2000, defendant was placed in another perpetrator program and was discharged after a month because the staff was unable to provide protection to the community and residents due to defendant's "violent fantasies." He was then placed at a mental institution. Once stabilized, he was discharged to a shelter, where there were incidents of inappropriate touching.

¶ 14    From December 2000 to August 2001, defendant temporarily lived with his father and attended a special education program. In July 2001, his father requested defendant be placed in a shelter due to his inappropriate sexual and criminal behavior. Defendant's father stated he was stealing underwear from his stepmother and other people in the community and stole videotapes from a local police officer. Defendant also broke into a home, where he stole money and expensive stereo equipment.

¶ 15    From August 2001 to December 2001, defendant was placed in a shelter, where he received psychiatric treatment. The staff noted he did very well controlling himself, no longer appeared to be depressed, no longer had sexual fantasies, and was meeting his anger management goals. In December 2001, defendant's father stated he was not employed and wanted defendant to return home, where he could supervise him and arrange for his counseling. The temporary home arrangement was successful, and his father stated defendant was doing very well. Defendant's father noted he began to act strangely in March 2002. He noted defendant would leave the house in the middle of the night, and one time he walked around the house with a baseball bat for no reason. On March 5, 2002, one day before the stabbing in the present case, defendant was court-ordered to be permanently placed at home with supervision.

¶ 16    Defendant created a number of problems in jail while awaiting trial in the present case. He arranged a jail escape plan where he planned to use his eyeglasses as a weapon, was aggressive with his cellmate, destroyed property, threatened to "shank" someone, used obscene language, engaged in sex acts with a cellmate, and passed notes between cells, all in violation of the jail's rules. One of the notes defendant passed referenced one of the officers and said defendant was "exactly [two] seconds away from splitting skulls." Defendant self-reported he was involved in 12 fights while in jail that were not recorded.

¶ 17    The trial court sentenced defendant to natural life in prison. In imposing its sentence, the court stated:

> "[T]he only difficulty *** the court struggles with here is the defendant's age. He is a young man. I know—although the court certainly acknowledges that young people are entitled, if you will, to learn from their mistakes. But the acts of the defendant here are too senseless and too vicious to give a great deal of weight to his age, particularly given the history here, *** [and] the multiple attempts by the State of Iowa to rehabilitate the minor without success ***.
>
> And although defendant is of a young age chronologically, he is not in terms of the efforts that have been expended to attempt to correct his behavior."

¶ 18    On October 9, 2003, defendant filed a motion to reconsider, which the trial court denied.

### C. Appeal from the Sentence

¶ 20    On appeal from his conviction and sentence, defendant argued the trial court abused its discretion in sentencing him to natural life in prison. Among other things, defendant disagreed with the court's assessment of youth as a mitigating factor. *Stafford*, slip order at 7. This court found the trial court did not abuse its discretion in sentencing defendant to natural life in prison and the court adequately considered defendant's rehabilitative potential, as it mentioned age was the factor it struggled with the most. *Id.*

¶ 21                              D. Postconviction Petition

¶ 22        On June 14, 2013, defendant filed a *pro se* postconviction petition. Defendant argued under *Miller*, 567 U.S ___, 132 S. Ct. 2455, he was entitled to a new sentencing hearing because his life sentence was unconstitutional under the eighth amendment's ban on cruel and unusual punishment. U.S. Const. amend. VIII. The trial court appointed counsel to assist with the petition, and trial counsel filed a certificate in compliance with Illinois Supreme Court Rule 651(c) (eff. Apr. 26, 2012), indicating he determined no amendments to the *pro se* petition were necessary.

¶ 23        On December 2, 2013, the State filed a motion to dismiss (735 ILCS 5/2-615 (West 2012)). The State argued the *Miller* decision found a mandatory life sentence for juveniles unconstitutional, unlike the discretionary life sentence defendant received.

¶ 24        On March 27, 2014, the trial court granted the State's motion to dismiss.

¶ 25        This appeal followed.


¶ 26                                    II. ANALYSIS

¶ 27        On appeal, defendant argues we should remand for resentencing because (1) his natural life sentence is void because it was not authorized by statute and, (2) under *Miller*, his discretionary life sentence was imposed without individualized considerations of youth and all that accompanies it. The State argues (1) defendant's sentence is not void and, even if it was, Illinois has abolished the void sentence rule he relies upon and (2) defendant is not entitled to a new sentencing hearing under *Miller*. We address each of these contentions in turn.


¶ 28                                 A. Void Sentence Rule

¶ 29        On appeal from the dismissal of his postconviction petition, defendant argues for the first time his life sentence is void because it was not authorized by statute. More specifically, defendant argues the felony murder statute the State used to enhance his sentence required him to be 18 years old at the time of the offense, and he was only 17. See 720 ILCS 5/9-1(b)(6) (West 2002).

¶ 30        Our supreme court abolished the void sentence rule, which stated a sentence not authorized by law is void and can be attacked at any time. *People v. Castleberry*, 2015 IL 116916, ¶ 19, 43 N.E.3d 932; see *People v. Arna*, 168 Ill. 2d 107, 658 N.E.2d 445 (1995). Defendant asserts *Castleberry* cannot retroactively apply to his case, and in support thereof, he filed a motion to cite additional authority, asking this court to adopt the First District's determination *Castleberry* cannot be applied retroactively. See *People v. Smith*, 2016 IL App (1st) 140887, ¶ 30. The State argues *Castleberry* does apply retroactively and, therefore, defendant cannot challenge his sentence as void.

¶ 31        In *Smith*, the First District examined *Teague v. Lane*, 489 U.S. 288 (1989) (plurality opinion), to determine whether *Castleberry* applied retroactively. *Smith*, 2016 IL App (1st) 140887, ¶¶ 24-26. "Under *Teague*, a judicial decision that establishes a new rule applies to all criminal cases pending on direct review. [Citation.] New rules will not apply to convictions that are final at the time the new rule is announced ***." *Id*. ¶ 24. " '[A] case announces a new rule if the result was not dictated by precedent existing at the time the defendant's conviction became final.' " *Id.* ¶ 25 (quoting *Teague*, 489 U.S. at 301). The defendant in *Smith* argued *Castleberry* announced a new rule and was not dictated by precedent existing when his case

became final in 1999, and therefore he should be allowed to challenge his sentence under *Arna*. *Id.* ¶ 27. The defendant also relied on the specific language used in *Castleberry* for the proposition it created a new rule, such as when the supreme court stated it was " 'departing from precedent' " and " 'abolished' " the void sentence rule. *Id.* (quoting *Castleberry*, 2015 IL 116916, ¶ 19, 43 N.E.3d 932).

¶ 32 The First District held "*Castleberry* did not announce a new rule but merely abolished the rule stated in *Arna*, thereby reinstating the rule in effect before *Arna*: a sentence that did not comply with statutory guidelines was only void if the court lacked personal or subject matter jurisdiction." *Id.* ¶ 29. The court continued to note, "[b]ecause *Castleberry* did not announce a new rule and cannot be applied retroactively, defendant has the right to challenge his sentence unauthorized by the sentencing statute \*\*\* pursuant to *Arna* and *Thompson*. *Castleberry* only applies prospectively from the date of pronouncement, November 15, 2015." *Id.* ¶ 30.

¶ 33 We agree with the First District—*Castleberry* did not create a new rule but merely abolished one. However, we decline to adopt its conclusion. Because *Castleberry* did not create a new rule, its holding *does* apply retroactively. See *Teague*, 489 U.S. at 301. Due to the abolition of the void sentence rule in *Castleberry*, the rule pre-*Arna* is reinstated: a sentence can only be challenged at any time as void if the court lacked personal or subject matter jurisdiction. *People v. Davis*, 156 Ill. 2d 149, 156, 619 N.E.2d 750, 754 (1993). Because defendant does not challenge the trial court's personal or subject matter jurisdiction, under *Castleberry*, we need not address whether his sentence is void.

¶ 34                                            B. Defendant's Petition

¶ 35 The Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 to 122-7 (West 2012)) "provides a method by which persons under criminal sentence in this state can assert that their convictions were the result of a substantial denial of their rights under the United States Constitution or the Illinois Constitution or both." *People v. Tate*, 2012 IL 112214, ¶ 8, 980 N.E.2d 1100. An action under the Act is a collateral attack on the trial court proceedings, and issues that could have been raised on appeal, but were not, are forfeited. *Id.*

¶ 36 There are three stages for postconviction proceedings in a noncapital case. At the first stage, the trial court determines, while taking the allegations as true, whether the petition is frivolous or without merit. 725 ILCS 5/122-2.1(a)(2) (West 2012). A petition is deemed frivolous or without merit when it has no arguable basis in either law or in fact. *People v. Hodges*, 234 Ill. 2d 1, 16, 912 N.E.2d 1204, 1212 (2009). If the petition survives the first stage, it will advance to the second stage, where counsel may be appointed to an indigent defendant and the State is now a respondent to the litigation. 725 ILCS 5/122-4, 122-5 (West 2012). At this stage, the court must determine whether the petition makes "a substantial showing of a constitutional violation" when liberally construed in light of the trial record. (Internal quotation marks omitted.) *Tate*, 2012 IL 112214, ¶ 10, 980 N.E.2d 1100; *People v. Coleman*, 183 Ill. 2d 366, 382, 701 N.E.2d 1063, 1072 (1998). If a substantial showing is made, the proceeding will advance to the third stage for an evidentiary hearing. 725 ILCS 5/122-6 (West 2012). If a substantial showing is not made at the second stage, the petition is dismissed.

¶ 37 In his postconviction petition, defendant argued he was entitled under *Miller* to a new sentencing hearing because his life sentence was unconstitutional under the eighth amendment's ban on cruel and unusual punishment. On appeal from the dismissal of his postconviction petition, he asks this court to remand to the trial court for a new sentencing

hearing, where the court should consider individualized considerations of youth and all that accompanies it. Defendant's petition was dismissed at the second stage. The trial court's dismissal of a postconviction petition at the second stage is reviewed *de novo*. *People v. Snow*, 2012 IL App (4th) 110415, ¶ 15, 964 N.E.2d 1139.

¶ 38 In *Miller*, the United States Supreme Court held mandatory life sentences for juveniles violates the eighth amendment's ban on cruel and unusual punishment. *Miller*, 567 U.S. at ___, 132 S. Ct. at 2464. This decision followed two other significant cases concerning juvenile sentencing. *Roper v. Simmons*, 543 U.S. 551, 578 (2005) (prohibiting a trial court from imposing the death penalty on a defendant who was under the age of 18 when the crime was committed); *Graham v. Florida*, 560 U.S. 48, 74 (2010) (prohibiting a trial court from sentencing a juvenile to life without parole for an offense other than homicide). The Court reached this conclusion "not only on common sense—on what 'any parent knows'—but on science and social science as well." *Miller*, 567 U.S. at ___, 132 S. Ct. at 2464. In previous decisions, the Court noted studies indicating only a small portion of adolescents who engage in illegal activity actually develop ingrained patterns of problem behavior. *Id.* Studies have also supported a fundamental difference in brain development between adolescents and adults, for example, parts of the brain involved in behavior control. *Id.* at ___, 132 S. Ct. at 2464. The Court believed a child's culpability is lessened because of transient rashness, proclivity for risk, and inability to assess consequences, and as the child ages, deficiencies will be reformed. *Id.* at ___, 132 S. Ct. at 2464-65.

¶ 39 After the *Miller* decision came *Montgomery v. Louisiana*, 577 U.S. ___, 136 S. Ct. 718 (2016), which expanded on the holding from *Miller*. In *Montgomery*, the Court stated *Miller* applies retroactively and state courts must give *Miller* effect in collateral proceedings. *Id.* at ___, 136 S. Ct. at 732. *Miller* did not ban all life sentences for juveniles, but reserved this sentence for "the rare juvenile offender whose crime reflects irreparable corruption." (Internal quotation marks omitted.) *Id.* at ___, 136 S. Ct. at 734. The Court went on to note, even if a trial court considers a child's age when issuing a life sentence, the sentence will still violate the eighth amendment if the crime reflects "unfortunate yet transient immaturity." (Internal quotation marks omitted.) *Id.* at ___, 136 S. Ct. at 734. Other courts have interpreted *Montgomery* to expand to discretionary life sentences, and under *Miller*, these juveniles must be given an opportunity to demonstrate they belong to the larger population of juveniles not subject to natural life in prison without parole. *People v. Nieto*, 2016 IL App (1st) 121604, ¶ 47, 52 N.E.3d 442. In *McKinley v. Butler*, 809 F.3d 908, 910-11 (7th Cir. 2016), the United States Court of Appeals for the Seventh Circuit noted "[t]here is more to *Miller*" and sentencing courts must consider how children are different.

¶ 40 In this case, the State argued to the trial court defendant's petition should be dismissed because he received a discretionary life sentence, in contrast to the mandatory life sentence for juveniles banned in *Miller*. The court dismissed defendant's petition without a written order or an explanation on the record for the basis of the dismissal. As discussed, the holding in *Miller* is not exclusive to mandatory life sentences for juveniles. See *Montgomery*, 577 U.S. at ___, 136 S. Ct. at 734. Even though the trial court did not explain its reason for dismissing defendant's petition, a reviewing court may affirm the court's dismissal on any grounds substantiated by the record. *Snow*, 2012 IL App (4th) 110415, ¶ 17, 964 N.E.2d 1139.

¶ 41 On appeal from the dismissal of defendant's petition, he argues his sentencing hearing did not comport with *Miller*, and he requests this court to vacate his sentence and remand for a

proper hearing considering "youth and all that accompanies it." Defendant has filed *Nieto*, *McKinley*, and *Montgomery* as additional authority in support of his argument. The State argues defendant has failed to persuade he is entitled to a new sentencing hearing because the trial court gave full consideration to the mitigation of defendant's youth and age-related characteristics.

¶ 42 In *Nieto*, the First District examined the decisions in *Miller* and *Montgomery* to determine whether a juvenile's *de facto* life sentence violated the eighth amendment. In *Nieto*, the defendant, age 17, was a member of the Latin Kings and fatally shot one person and injured another, who allegedly used a sign disrespecting the Latin Kings. *Nieto*, 2016 IL App (1st) 121604, ¶ 4, 52 N.E.3d 442. After the shooting, the defendant told his brother-in-law he " 'lit up some flakes' " and one victim received a " 'dome shot.' " *Id.* A jury found defendant guilty of first degree murder and aggravated battery with a firearm. *Id.*

¶ 43 The PSI showed the defendant's highest level of education was the eighth grade. *Id.* ¶ 6. He was expelled from school during his freshman year of high school for fighting. *Id.* He was unemployed but did some remodeling work and sold drugs to support himself. *Id.* The defendant stated he resided with his maternal grandmother because his mother was a drug addict and his father was in poor health, having been shot and stabbed multiple times. *Id.* ¶ 7. The defendant smoked marijuana daily. *Id.* ¶ 8. As a minor, he previously committed armed robbery, attempted armed robbery, and possession of cannabis. *Id.* During the proceedings for the charges of first degree murder and aggravated battery with a firearm, he had pending charges of involuntary manslaughter and reckless discharge of a firearm for accidentally killing his younger brother. *Id.*

¶ 44 In sentencing the defendant, the trial court considered a number of factors: gang activity, firearm use, lack of serious provocation, statements the defendant made to his brother-in-law following the incident, use of police scanners to avoid prosecution, recidivism (the killing of his brother during the pending charges), remorse for his brother's death, gang activity deterrence, age, and lack of rehabilitative potential. *Id.* ¶ 10. The court believed the defendant could be part of " 'a pivotal change' " to work with the gangs in prison and rectify his wrongdoings. *Id.* ¶ 12. The court went on to state, it " 'believ[ed] there is something good in [the defendant].' " *Id.* The court sentenced him to 35 years of imprisonment for first degree murder, 25 years of imprisonment for reckless discharge of a firearm, and 18 years for aggravated battery with a firearm, to be served consecutively, for a total of 78 years. *Id.*

¶ 45 The defendant filed an appeal and argued, among other things, his sentence was excessive. *Id.* ¶ 16. The First District affirmed his sentence. *Id.* The defendant filed a postconviction petition arguing, under *Miller*, his *de facto* life sentence was unconstitutional. *Id.* ¶ 18. On review from the first-stage dismissal of the defendant's postconviction petition, the court stated, "[a]lthough the trial court exercised its discretion in imposing defendant's sentence, the court's reasoning did not comport with the juvenile sentencing factors recited in *Roper*, *Graham*, *Miller*[,] and *Montgomery*." *Id.* ¶ 52.

¶ 46 In deciding whether the defendant was entitled to a new sentencing hearing, the reviewing court stated, in pertinent part, as follows:

"[T]he trial court's findings do not imply that it believed defendant was the *rarest* of juveniles whose crime showed that he was permanently incorrigible. The court clearly found that for the foreseeable future, defendant was likely to engage in further criminal conduct in light of the Latin Kings' influence over him and the tragic shooting of his

- 8 -

brother. Given juveniles' susceptibility to peer pressure and recklessness, this is hardly surprising. Yet, susceptibility to peer pressure and recklessness erode with age. Indeed, the trial court found that in the future, defendant could change his life and even help other gang members change their ways. Although the court found defendant would have to do that in prison, contributing to the prison population differs from the opportunity to contribute to society. Additionally, the court found defendant's sentence was necessary to deter not only him, but other gang members. We now know, however, that defendant's sentence is not likely to deter anyone. See [*Miller*, 567 U.S. at ___, 136 S. Ct. at 726] (observing that deterrence is diminished in juvenile sentencing because juveniles' recklessness, immaturity[,] and impetuosity make them less likely to consider possible punishment)." (Emphasis in original.) *Id.* ¶ 55.

Even though the trial court considered the defendant's young age, "examining these factors through the lenses of *Miller* may have led to a shorter sentence." *Id.* ¶ 56. The court remanded to the trial court for resentencing of the defendant. *Id.* ¶ 59.

¶ 47    Based on the record before us, defendant is not entitled to a new sentencing hearing. We find defendant's case distinguishable from *Nieto*. The First District stressed the trial court's reasoning in *Nieto* was inconsistent with research regarding juveniles and their rehabilitative ability. *Id.* ¶ 55. For example, the defendant was a member of the Latin Kings and the sentencing court noted peer pressure played a large role in his actions. *Id.* (the reviewing court noted this is an improper factor to heavily weigh because "susceptibility to peer pressure and recklessness erode[s] with age"). The sentencing court also stated it wanted to use the defendant's sentence as a deterrent for the defendant and other gang members. *Id.* (the reviewing court found the defendant's sentence is not likely to deter anyone because "juveniles' recklessness, immaturity[,] and impetuosity make them less likely to consider possible punishment"). As a result, the First District found the rationale behind the defendant's sentence inconsistent with scientific research.

¶ 48    In the case at bar, the trial court did not attribute defendant's actions to peer pressure or use his sentence as a deterrent. Further, in contrast to *Nieto*, the court did not rely on any factors debunked by science. Rather, defendant's sentence was imposed to keep the community safe. Defendant's father expressed his concern at the sentencing hearing regarding defendant's possible release and believed imprisonment was necessary, as he was worried if defendant was ever released back into society, he would continue to hurt people.

¶ 49    Defendant broke into the home of an acquaintance, his school bus monitor, to steal videotapes. The record shows the victim previously allowed defendant to borrow tapes from her and defendant noted he liked to talk with her. While rummaging through the victim's video collection, he heard a noise coming from the victim's bedroom. Defendant grabbed a knife just in case he was discovered and saw the victim as he opened the door. As she walked toward the door, he, unprovoked, stabbed her up to 45 times in the face, arms, legs, and stomach. He became enraged as she attempted to fight him off. When defendant determined her to be deceased, he laid her on the bed and held her as he said "Good-bye bitch." He then washed his hands and resumed looking through her video collection and stole whatever he wanted.

¶ 50    The PSI relied on by the trial court showed there were a number of attempts to assist defendant in dealing with his behavioral issues. At the age of eight, defendant expressed to one of his teachers he wanted to be a murderer when he grew up and he liked to pretend he was stabbing people. At the age of 12, another teacher reported he bragged about fighting with

other students and members of the community. Also at the age of 12, defendant sexually abused his two younger brothers, who were ages 8 and 10. Following this abuse, defendant was court-ordered into a shelter and remained in different shelters and facilities for the next five years. Shelter reports indicate defendant was caught in sexually inappropriate situations, was prone to stealing, showed no remorse for sexually abusing his brothers, and assaulted staff members. He was also discharged from shelters due to his violent fantasies and the shelters' inability to keep others safe due to defendant's behavior. When defendant was temporarily placed at home with his father, he was caught stealing underwear from his stepmother and others in the community. He was also caught stealing videotapes from a police officer and stereo equipment from a member of the community. After defendant returned to the shelter, he was given another opportunity to temporarily reside with his father, and his father reported defendant was doing well. One day after defendant was court ordered to reside with his father permanently with supervision, the stabbing in the present case occurred.

¶ 51    While in jail awaiting trial in the present case, defendant caused a number of problems. He devised a jail escape plan where he intended to use his eyeglasses as a weapon, was involved in at least 12 fights, engaged in sex acts with his cellmate, passed notes between cells, used obscene language, destroyed property, threatened to "shank" someone, and, in a note, referenced an officer and said he was "exactly [two] seconds away from splitting skulls."

¶ 52    Although the trial court did not explicitly state defendant was one of the *rarest* of juvenile offenders whose crime showed a life sentence is appropriate, the court's reasoning certainly conveys the same conclusion. There was a plethora of documents and records filed with the court to consider at sentencing. Defendant's history showed a pattern of physical and sexual aggression, usually aimed toward women. The court stated it struggled with defendant's age the most, as it believed juveniles are entitled to learn from their mistakes. However, due to the senselessness and viciousness of defendant's crime, the court did not believe defendant deserved another chance. The court stated, "[a]nd although defendant is of a young age chronologically, he is not in terms of the efforts that have been expended to attempt to correct his behavior," and therefore, a life sentence was the only viable sentence. The record is devoid of any indication the court considered an improper factor or rationale when it issued defendant's sentence. The court expressed an understanding that "children are different" and noted juveniles are "entitled" to learn from their mistakes. We find the court properly considered defendant's age under *Miller* and based on the circumstances of the crime and defendant's history, a natural life sentence was appropriate.

¶ 53                                    III. CONCLUSION

¶ 54    For the reasons stated, we affirm the trial court's dismissal of defendant's postconviction petition. As part of our judgment, we award the State its $75 statutory assessment as costs of this appeal. 55 ILCS 5/4-2002(a) (West 2014).

¶ 55    Affirmed.