# Illinois Official Reports

## Appellate Court

---

### *People v. Stafford*, 2018 IL App (4th) 140309-B

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DAVID P. STAFFORD, Defendant-Appellant. |
| | |
| District & No. | Fourth District<br>Docket No. 4-14-0309 |
| | |
| Filed | June 19, 2018 |
| | |
| Decision Under Review | Appeal from the Circuit Court of Woodford County, No. 02-CF-26; the Hon. John B. Huschen, Judge, presiding. |
| | |
| Judgment | Affirmed. |
| | |
| Counsel on Appeal | James E. Chadd, Jacqueline L. Bullard, and Amanda S. Kimmel, of State Appellate Defender's Office, of Springfield, for appellant.<br><br>Gregory Minger, of Eureka (Patrick Delfino, David J. Robinson, and Allison Paige Brooks, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| | |
| Panel | JUSTICE KNECHT delivered the judgment of the court, with opinion.<br>Presiding Justice Harris and Justice Turner concurred in the judgment and opinion. |

**OPINION**

¶ 1     In August 2003, a jury found defendant, David P. Stafford, guilty of four counts of first degree murder (720 ILCS 5/9-1(a)(1), (2) (West 2002)) and one count of first degree felony murder (residential burglary) (*id.* §§ 9-1(a)(3), 19-3(a)). In October 2003, the trial court sentenced defendant to natural life in prison (*id.* § 9-1(b)(6)(a)-(c)). Defendant appealed, arguing the trial court abused its discretion when it sentenced him to natural life in prison. In February 2006, we affirmed defendant's sentence. *People v. Stafford*, No. 4-03-1011 (Feb. 23, 2006) (unpublished order under Illinois Supreme Court Rule 23).

¶ 2     In June 2013, defendant filed a *pro se* postconviction petition alleging his life sentence was unconstitutional under the United States Supreme Court's decision in *Miller v. Alabama*, 567 U.S. 460 (2012), because he was 17 years old when the crime was committed and his life sentence violated the eighth amendment's ban on cruel and unusual punishment (U.S. Const., amend. VIII). The State filed a motion to dismiss defendant's postconviction petition, which the trial court granted. Defendant appealed, arguing (1) his natural life sentence was void because it was not authorized by statute and (2) under *Miller*, his discretionary life sentence was imposed without individualized considerations of youth and all that accompanies it. In September 2016, we affirmed the dismissal of defendant's postconviction petition. *People v. Stafford*, 2016 IL App (4th) 140309. Defendant filed a petition for leave to appeal with the Illinois Supreme Court.

¶ 3     In November 2017, the supreme court denied defendant's petition for leave to appeal but issued a supervisory order (*People v. Stafford*, No. 121393 (Ill. Nov. 22, 2017) (supervisory order)) directing us to vacate our prior judgment and consider the effect of *People v. Holman*, 2017 IL 120655, on the issue of whether defendant's sentence violates the eighth amendment (U.S. Const., amend. VIII) and determine whether a different result is warranted.

¶ 4     Both defendant and the State have now filed supplemental briefs with this court. Defendant has also supplemented the record to include defense exhibits admitted into evidence at his sentencing hearing, which were not part of the record at the time of our original disposition. In accordance with the supreme court's directive, we vacate our prior judgment and reconsider in light of *Holman*. We again affirm the dismissal of defendant's postconviction petition.

¶ 5                                     I. BACKGROUND
¶ 6                                         A. Trial
¶ 7     The evidence presented at trial showed Cherie Gillson was murdered in the bedroom of her Eureka, Illinois, home on March 6, 2002. The victim had at least 45 discrete stab wounds in multiple locations, including her face, arms, legs, and stomach. A doctor testified, based on several of the wounds, "severe" force had been used. The victim's nine-year-old son was asleep in the basement at the time of the killing. The victim's son found his mother later in the morning and called for help. On March 7, 2002, the victim's neighbors informed the police they found a blue leather jacket, stained with blood and with dark hair caught in the zipper, in their yard. Defendant's father later identified the jacket as belonging to defendant.

¶ 8     On March 17, 2002, the police recorded defendant's confessional statement. Defendant, then 17 years old, claimed he went into the victim's home to steal videotapes. Defendant stated he knew the victim, as she was a school bus monitor, and she had previously let him borrow

videotapes. He thought he heard a sound coming from one of the bedrooms. He grabbed a knife from the victim's kitchen in case he was discovered. Defendant opened the door to the victim's room and stabbed her in the stomach when she walked toward the door. The victim hit defendant, which enraged him, and he continued to stab her. Defendant lay down next to the victim as she died. Defendant stated he held her and said, "Good-bye bitch." After he determined the victim was deceased, he went into the kitchen to wash his hands and proceeded to steal videotapes from her entertainment center. Defendant later said he did not know what he would have done if the victim's son had walked into the room. After defendant's confessional statement, the police conducted a search of his bedroom. The police found two videotapes, which matched the tapes defendant said he had taken from the victim's home. Defendant's fingerprints also matched the latent prints found on the victim's remaining videos.

¶ 9      The jury found defendant guilty of four counts of first degree murder (720 ILCS 5/9-1(a)(1), (a)(2) (West 2002)) (counts I, II, III, and IV) and one count of first degree felony murder (residential burglary) (*id.* §§ 9-1(a)(3), 19-3(a)) (count V) for the stabbing of Cherie Gillson.

¶ 10                                    B. Sentencing

¶ 11      On October 6, 2003, the trial court held a sentencing hearing. The court received a presentence investigation report (PSI) and its addendum. The State presented testimony and a victim impact statement from the brother of the victim. The State also presented a supplement to the PSI. The defense presented testimony from the probation officer tasked with preparing defendant's PSI and defendant's father. The defense also presented five exhibits of documents previously provided to the probation officer tasked with preparing the PSI.

¶ 12      In 1987, when defendant was two years old, his parents divorced. Defendant's father was given custody, and he later remarried. Defendant had a number of behavioral issues while in his father's care. On one occasion, he was caught playing with his penis on a school bus. On another occasion, he took a knife from home onto the school bus. In 1993, when defendant was eight years old, a teacher reported defendant had social and emotional problems: he liked to play he was stabbing people, and he said when he grew up, he wanted to be a murderer. That same year, defendant was diagnosed with attention deficit hyperactivity disorder and found to have a full-scale intelligence quotient (IQ) of 75.

¶ 13      In 1997, when defendant was 12 years old, a teacher noted defendant spoke with great bravado regarding how he attacked a peer and sent him to the hospital, cut an adult with a beer bottle, and threatened another adult with a gun, and he threatened a female student with a knife. That same year, defendant's father sent defendant to live with his mother in Iowa because he was having marital issues and living in a car. Since her divorce with defendant's father, defendant's mother remarried and had two additional children. Shortly after defendant arrived in Iowa, he began sexually assaulting his two younger brothers, ages 8 and 10. Defendant was taken into care, and a petition for a child in need of assistance was filed. While in care, defendant had numerous sexual issues; for example, he was fixated on sexual subjects, accused a roommate of sexually abusing him, and complained to staff he masturbated to the point of soreness. On May 9, 1997, defendant was adjudicated a child in need of assistance.

¶ 14      A May 13, 1997, psychological evaluation noted defendant "came across in the interview as perhaps mildly mentally limited *** because[,] although he seemed alert, aware[,] and able to comprehend ***, his responses were at times a bit inappropriate[,] *** say[ing] exactly

- 3 -

what was on his mind—although at times it might have been better left unsaid." Defendant tested at a full-scale IQ of 75, which placed him in the lower fifth percentile compared to other 12-year-olds. He had a fairly good fund of information and an ability to learn by what he hears. He also had reasonably good awareness of social situations, where he learned by observation. Defendant, however, needed improvement in areas reflecting abstract reasoning. His abstract reasoning scores were "low enough to put [him] into the profoundly limited range and this often means that there is some brain dysfunction as a result of a drug overdose quite probably from the time he was being carried [in utero]." The evaluator found defendant's IQ "can be [a] fairly permanent limitation that will keep him from making significant academic progress, but his auditory learning skills should be good enough to help him get through high school."

¶ 15        On June 10, 1997, defendant was ordered to go to a mental health institute for an inpatient psychiatric evaluation due to a strange discussion with his guardian *ad litem* referencing Satan. Defendant was diagnosed with conduct disorder and parent-child problems. The staff observed he had an inflated self-esteem, bragged about sexual conquests, and bragged about his knowledge of gangs.

¶ 16        From ages 12 to 17, defendant was placed in approximately 13 facilities and shelters in Iowa, which he claimed was due to "anger and voices in [his] head." In July 1997, defendant was placed in a psychiatric medical institute for children, where he was hospitalized for two weeks due to a major episode of aggression. In its evaluation, the institute noted defendant was of above average intelligence and diagnosed him with major depression, attention deficit/hyperactivity disorder, and conduct disorder (childhood onset type). Defendant was consistently unable to comply with the rules, was caught in sexually inappropriate situations, was prone to stealing, and showed no remorse for sexually abusing his brothers. Defendant assaulted a female staff member, which ultimately led to his unsuccessful discharge.

¶ 17        In May 1998, defendant began a court-ordered perpetrators program. Defendant was diagnosed with attention deficit hyperactivity disorder and conduct disorder (childhood onset type). In October 1999, defendant was discharged, and it was the staff's opinion defendant would continue to commit sexual crimes against those whom he saw as weaker than him without close supervision.

¶ 18        In February 2000, defendant was placed in another perpetrator program and was discharged after a month because the staff was unable to provide protection to the community and residents due to defendant's "violent fantasies." He was then placed at a mental institution. Once stabilized, he was discharged to a shelter, where there were incidents of inappropriate touching.

¶ 19        From December 2000 to August 2001, defendant temporarily lived with his father and attended a special education program. In March 2001, defendant was diagnosed with having mood swings with secondary anger and depression. In July 2001, defendant's father requested defendant be placed in a shelter due to his inappropriate sexual and criminal behavior. Defendant's father stated defendant was stealing underwear from his stepmother and other people in the community and stole videotapes from a local police officer. Defendant also broke into a home, where he stole money and expensive stereo equipment.

¶ 20        From August 2001 to December 2001, defendant was placed in a shelter, where he received psychiatric treatment. The staff noted he did very well controlling himself, no longer appeared to be depressed, no longer had sexual fantasies, and was meeting his anger management goals.

¶ 21 In December 2001, defendant's father stated he was not employed and wanted defendant to return home, where he could supervise him and arrange for his counseling. The temporary home arrangement was successful, and his father stated defendant was doing very well. Defendant's father noted defendant began to act strangely in March 2002. He noted defendant would leave the house in the middle of the night, and one time he walked around the house with a baseball bat for no reason. On March 5, 2002, one day before the stabbing in this case, defendant was court-ordered to be permanently placed at home with supervision.

¶ 22 Prior to trial, the defense requested, and the trial court appointed, a psychiatrist to evaluate defendant. The defense later requested a fitness examination, which the trial court rejected, concluding a *bona fide* doubt of fitness did not exist. Defendant created a number of problems in jail while awaiting trial. He arranged a jail escape plan where he planned to use his eyeglasses as a weapon, was aggressive with his cellmate, destroyed property, threatened to "shank" someone, used obscene language, engaged in sex acts with a cellmate, and passed notes between cells, all in violation of the jail's rules. One of the notes defendant passed referenced one of the officers and said defendant was "exactly [two] seconds away from splitting skulls." Defendant self-reported he was involved in 12 fights while in jail that were not recorded.

¶ 23 Defendant reported he had a close relationship with his father. Defendant seldom heard from his mother, and he did not have a close relationship with her. Defendant's mother was reportedly "a recovering alcoholic and drug addict with a chromosomal disorder and [had] a history of physical and emotional abuse by her biological mother." She also reportedly had "a sporadic work history and mental illness." Defendant reported his mother's boyfriends had "abused him by beating him with fists and boards." Defendant's mother previously reported a man with whom she lived for two years had sexually abused her three children.

¶ 24 Defendant's highest level of education was the tenth grade. Defendant acknowledged having difficulty with controlling his anger. Defendant's school records show he was suspended from school for fighting and, on a separate occasion, he was suspended for assaulting a student and threatening a bus driver.

¶ 25 Defendant reported his mental status at the time of the interview for the PSI was " 'pretty messed up.' " He stated he heard voices telling him to fight and come up with an escape plan from jail and court. Defendant admitted having thoughts of suicide and explained he experienced long-term depression since age seven. He provided specific instances in his life where he attempted suicide. At age seven, he attempted to set his shirt on fire because his mother came home drunk, punched him twice, and called him "worthless." At age 12, he overdosed on pills because his stepmother left without adopting him. At age 14, he tied a bedsheet around the rafters at a shelter to hang himself because he was told he could not go home until he was 18 years old. At age 16, he thought of using a paring knife to cut his arms because he was tired of his mother hurting him and tired of everyone letting him down. While incarcerated, he imagined "doing a 'swan dive off the second floor and snapping my neck' " after learning his mother was going to marry a man " 'who was in prison for beating his former wife.' "

¶ 26 Defendant's father testified defendant showed signs of aggression toward women and "ha[d] a problem with their authority." Prior to sentencing, defendant's father wrote a letter to the trial court, expressing his love for his son but also his fear defendant would hurt more people if he were ever released into society again.

¶ 27      After the presentation of the evidence, defendant was allowed the opportunity to make a statement. Defendant declined to do so.

¶ 28      In argument, the State highlighted the circumstances of the offense, noting the "brutal murder[ ] was over two videotapes and four CDs." The State highlighted a lack of demonstrated remorse by defendant. The State asserted the evidence showed defendant had "been a violent, dangerous person for the majority of his life" and "not someone that should ever be in public again." The State noted: "[T]his isn't a case where [the defendant] is so low functioning, so unintelligent that he doesn't understand the difference between right and wrong." The State argued the trial court's dealing with defendant throughout the case demonstrated defendant was intelligent. As additional support, the State cited evidence from the PSI indicating individuals who dealt with defendant believed he was intelligent, as well as defendant's creation of an in-depth escape plan while he was incarcerated. The State acknowledged defendant did not have "a criminal history in court" but noted defendant admittedly committed residential burglary and acts of sexual molestation in the past. The State noted, while a "stiff sentence" would deter others from committing similar crimes, it was more important to impose such a sentence "to protect the public from [defendant] ever committing this crime again." The State argued defendant was "a dangerous predator" who "acted out his fantasies" and, if given the chance, would do it again. The State requested defendant be sentenced to natural life in prison.

¶ 29      The defense maintained defendant was remorseful, as indicated by a letter he wrote to the victim's son. The defense argued defendant had fallen through the cracks of the system. The defense highlighted defendant's IQ, which, the defense argued, the trial court "should take strong consideration" of when determining an appropriate sentence. The defense requested defendant be sentenced to "a fair and just sentence" of not less than 20 years and not more than 60 years.

¶ 30      In imposing its sentence, the trial court stated as follows:

     "Court has considered the evidence offered at trial, the [PSI], the [a]ddendum thereto, the evidence offered by the State this afternoon, as well as the evidence presented by the defendant.

     In terms of factors, the court has considered each and every relevant factor of aggravation and mitigation, and in particular the court has considered that the defendant's conduct caused serious harm, that the defendant has a history of criminal activity, and a sentence is necessary to deter others from committing the same crime. Court has also considered the factors in mitigation and would note that the defendant has no prior criminal convictions or prior juvenile adjudications for neglect or for delinquency.

     The court would note, however, through the various exhibits, which are both attached to the [PSI] as well as those presented by the defendant today, that the defendant at least since age *** 12 has been committing criminal acts. You can argue how serious those might be and whether they are just a puffing by the defendant or whether they are actual serious criminal acts but, nonetheless, the court finds that criminal acts were committed.

     The court, like everyone else, I suppose in this room, is absolutely appalled at the acts of Iowa. [Defense counsel] argues that Iowa should have been placed on notice of the behaviors of the defendant. And I'm sure that they probably were. Why they didn't

do anything about it is surely not answered anywhere in the reports. Because it appears that even though the defendant only made it to level two in one of his treatment programs, then reverted back to his prior behaviors, they nonetheless decided that independent living was the proper choice, in which ultimately led to the determination that returning home was the appropriate placement.

But that does not excuse in any way the behavior that[ ] [has] occurred here. The difficulty—the only difficulty that the court struggles with here is the defendant's age. He is a young man. I know—although the court certainly acknowledges that young people are entitled, if you will, to learn from their mistakes. But the acts of the defendant here are too senseless and too vicious to give a great deal of weight to his age, particularly given the history here, *** [and] the multiple attempts by the State of Iowa to rehabilitate the minor without success ***.

And although the defendant is of a young age chronologically, he is not in terms of the efforts that have been expended to attempt to correct his behavior. The court[,] *** fully understanding the arguments of the defense *** that the court does not have authority to sentence the defendant to life imprisonment, finds that this is the only viable sentence for this defendant. For multiple years the State of Iowa has attempted to cure this defendant of his deviant behavior without success. This court is on notice of those prior attempts and those prior acts.

The court *** is unwilling, given the senselessness, as well as the brutality and viciousness of this particular crime, to give [defendant] another chance at it. Sentence of this court is natural life."

¶ 31    On October 9, 2003, defendant filed a motion to reconsider, which the trial court later denied.

¶ 32                                C. Appeal from the Sentence

¶ 33    On appeal from his conviction and sentence, defendant argued the trial court abused its discretion in sentencing him to natural life in prison. Among other things, defendant disagreed with the court's assessment of youth as a mitigating factor. *Stafford*, slip order at 7. This court found the trial court did not abuse its discretion in sentencing defendant to natural life in prison and the court adequately considered defendant's rehabilitative potential, as it mentioned age was the factor it struggled with the most. *Id.*

¶ 34                                D. Postconviction Petition

¶ 35    On June 14, 2013, defendant filed a *pro se* postconviction petition. Defendant argued under *Miller* he was entitled to a new sentencing hearing because his life sentence was unconstitutional under the eighth amendment's ban on cruel and unusual punishment. U.S. Const., amend. VIII. The trial court appointed counsel to assist with the petition, and trial counsel filed a certificate in compliance with Illinois Supreme Court Rule 651(c) (eff. Apr. 26, 2012), indicating he determined no amendments to the *pro se* petition were necessary.

¶ 36    On December 2, 2013, the State filed a motion to dismiss defendant's postconviction petition. The State argued the *Miller* decision found a mandatory life sentence for juveniles unconstitutional, unlike the discretionary life sentence defendant received.

¶ 37　　On March 27, 2014, the trial court granted the State's motion to dismiss defendant's postconviction petition.

¶ 38　　This appeal followed.

¶ 39　　　　　　　　　　　　　II. ANALYSIS

¶ 40　　　　　　　　　A. The Post-Conviction Hearing Act

¶ 41　　The Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 to 122-7 (West 2012)) "provides a method by which persons under criminal sentence in this state can assert that their convictions were the result of a substantial denial of their rights under the United States Constitution or the Illinois Constitution or both." *People v. Tate*, 2012 IL 112214, ¶ 8, 980 N.E.2d 1100. An action under the Act is a collateral attack on the trial court proceedings, and issues that could have been raised on appeal, but were not, are forfeited. *Id.*

¶ 42　　There are three stages for postconviction proceedings in a noncapital case. At the first stage, the trial court determines, while taking the allegations as true, whether the petition is frivolous or patently without merit. 725 ILCS 5/122-2.1(a)(2) (West 2012). A petition is deemed frivolous or without merit when it has no arguable basis in either law or in fact. *People v. Hodges*, 234 Ill. 2d 1, 16, 912 N.E.2d 1204, 1212 (2009). If the petition survives the first stage, it will advance to the second stage, where counsel may be appointed to an indigent defendant and the State is now a respondent to the litigation. 725 ILCS 5/122-4, 122-5 (West 2012). At this stage, the court must determine whether the petition makes "a substantial showing of a constitutional violation" when liberally construed in light of the trial record. (Internal quotation marks omitted.) *Tate*, 2012 IL 112214, ¶ 10; *People v. Coleman*, 183 Ill. 2d 366, 382, 701 N.E.2d 1063, 1072 (1998). If a substantial showing is made, the proceeding will advance to the third stage for an evidentiary hearing. 725 ILCS 5/122-6 (West 2012). If a substantial showing is not made at the second stage, the petition is dismissed.

¶ 43　　Defendant's petition was dismissed at the second stage of postconviction proceedings. A trial court's dismissal of a postconviction petition at the second stage is reviewed *de novo*. *People v. Snow*, 2012 IL App (4th) 110415, ¶ 15, 964 N.E.2d 1139. A reviewing court may affirm a trial court's dismissal on any grounds substantiated by the record. *Id.* ¶ 17.

¶ 44　　　　　　　　　　　　B. Void Sentence Rule

¶ 45　　In his initial briefing before this court, defendant argued, for the first time on appeal from the dismissal of his postconviction petition, his life sentence was void because it was not authorized by statute. Specifically, defendant argued the felony murder statute the State used to enhance his sentence required him to be 18 years old at the time of the offense, and he was only 17. See 720 ILCS 5/9-1(b)(6) (West 2002).

¶ 46　　Defendant acknowledges our supreme court abolished the void sentence rule in *People v. Castleberry*, 2015 IL 116916, ¶ 19, 43 N.E.3d 932. Defendant asserts, however, *Castleberry* does not apply retroactively to his case. In support, defendant relied upon the First District's decision in *People v. Smith*, 2016 IL App (1st) 140887, ¶ 30, 51 N.E.3d 848. Defendant contends he may still attack his sentence as void because it was not authorized by statute. Defendant is wrong.

¶ 47　　In our initial, now-vacated opinion, we disagreed with the First District and concluded *Castleberry* applied retroactively. *People v. Stafford*, 2016 IL App (4th) 140309, ¶ 33. After

issuing our decision, another panel of this court reached the same conclusion, albeit on different grounds. See *People v. Cashaw*, 2016 IL App (4th) 140759, ¶ 33, 64 N.E.3d 1102.

¶ 48 Following the split amongst our districts on whether *Castleberry* applied retroactively, our supreme court addressed the issue in *People v. Price*, 2016 IL 118613, 76 N.E.3d 1240. The supreme court concluded *Castleberry* applied retroactively. *Id.* ¶¶ 26-27.

¶ 49 In accordance with *Price*, we reject defendant's argument. *Castleberry* applies retroactively. A sentence not authorized by statute does not render that sentence void. Defendant has not presented any alternative argument to find his sentence is void. Defendant's argument his sentence was not authorized by statute is forfeited, and we decline to consider it further.

¶ 50 C. Defendant's Sentence Under *Miller*

¶ 51 In his postconviction petition, defendant argued he was entitled under *Miller* to a new sentencing hearing because his life sentence was unconstitutional under the eighth amendment's ban on cruel and unusual punishment (U.S. Const., amend. VIII). In response, the State argued to the trial court defendant's petition should be dismissed because he received a discretionary life sentence, in contrast to the mandatory life sentence for juveniles banned in *Miller*. The court dismissed defendant's petition without a written order or an explanation on the record for the basis of the dismissal.

¶ 52 In his initial briefing before this court, defendant asked this court to vacate his sentence and remand to the trial court for a new sentencing hearing, where the court should consider individualized considerations of "youth and all that accompanies it." In response, the State argued defendant had failed to persuade he is entitled to a new sentencing hearing because the trial court gave full consideration to the mitigation of defendant's youth and age-related characteristics.

¶ 53 In his supplemental briefing before this court, defendant argues his sentence is constitutionally impermissible under *Holman* because the trial court (1) did not consider the *Miller* factors, (2) did not make a finding of permanent incorrigibility, and (3) improperly considered deterrence and criminality. In response, the State argues (1) the trial court's decision was in accordance with the *Holman* factors; (2) defendant's conduct showed irretrievable depravity, permanent incorrigibility, and irreparable corruption; and (3) the trial court properly considered statutory aggravating factors while exercising its discretion to impose a more severe prison term.

¶ 54 The eighth amendment of the United States Constitution prohibits the imposition of "cruel and unusual punishments" and applies to the states through the fourteenth amendment. U.S. Const., amends. VIII, XIV; *People v. Davis*, 2014 IL 115595, ¶ 18, 6 N.E.3d 709. " 'The concept of proportionality is central to the Eighth Amendment.' " *Davis*, 2014 IL 115595, ¶ 18 (quoting *Graham v. Florida*, 560 U.S. 48, 59 (2010)). That is, "criminal punishment should be graduated and proportioned to both the offender and the offense." *Id.* (citing *Miller*, 567 U.S. at 469, and *Roper v. Simmons*, 543 U.S. 551, 560 (2005)).

¶ 55 In a trilogy of cases, the United States Supreme Court addressed how the eighth amendment's ban on "cruel and unusual punishments" applies to sentencing juvenile defendants. In *Roper*, 543 U.S. at 578, the Court ruled the eighth amendment prohibits a trial court from imposing the death penalty on a defendant who was under the age of 18 when the

crime was committed. In *Graham*, 560 U.S. at 74, the Court ruled the eighth amendment prohibits a trial court from sentencing a juvenile to life without parole for an offense other than homicide. In *Miller*, 567 U.S. at 489-90, the Court ruled the eighth amendment forbids mandatory life sentences for juvenile offenders who are convicted of homicide. In these cases, the Court recognized juveniles differed from adults in three significant ways: (1) juveniles lack a maturity and have an underdeveloped sense of responsibility, (2) juveniles are more vulnerable or susceptible to negative influences and outside pressures, such as peer pressure, and (3) a juvenile's character is not as well formed as that of an adult. See *Davis*, 2014 IL 115595, ¶ 19 (citing *Graham*, 560 U.S. at 68, and *Roper*, 543 U.S. at 569-70).

¶ 56    In ruling the eighth amendment forbids mandatory life sentences for juvenile offenders who are convicted of homicide, the Supreme Court in *Miller* explained a court must take into account how children are different from adults for purposes of sentencing (567 U.S. at 480) and an offender's youth and attendant characteristics must be considered before imposition of life imprisonment without the possibility of parole (*id.* at 483). More recently, the Court ruled in *Montgomery v. Louisiana*, 577 U.S. ___, ___, 136 S. Ct. 718, 736 (2016), *Miller* applies retroactively and state courts must give *Miller* effect in collateral proceedings. In reaching its decision, the Court again reiterated (1) the need for a court to take into account how children are different from adults for purposes of sentencing and (2) an offender's youth and attendant characteristics must be considered before imposition of life imprisonment without the possibility of parole. *Id.* at ___, 136 S. Ct. at 733-34.

¶ 57    In our prior, now-vacated opinion we began by addressing whether *Miller* applied to defendant's discretionary life sentence. *Stafford*, 2016 IL App (4th) 140309, ¶¶ 38-40. After reviewing *Miller*, *Montgomery*, and persuasive case law addressing *Miller* and *Montgomery*, we found "the holding in *Miller* [was] not exclusive to mandatory life sentences for juveniles." *Id.* ¶ 40. We then applied *Miller* to defendant's discretionary life sentence to determine whether defendant was entitled to a new sentencing hearing. *Id.* ¶¶ 41-52. Based on our application, we found defendant's sentence was constitutionally permissible and, therefore, declined defendant's request for a new sentencing hearing. *Id.* ¶ 52. We are now charged with reconsidering our prior findings in light of the supreme court's decision in *Holman*. *Stafford*, No. 121393 (Ill. Nov. 22, 2017) (supervisory order).

¶ 58    In *Holman*, the defendant, who was 17 years old at the time of the crime, was convicted of first degree murder. *Holman*, 2017 IL 120655, ¶ 6. At sentencing, the trial court was presented with a PSI, which had attached to it multiple psychological reports, and heard testimony from a police officer who was involved in the investigation of two other recent murders for which defendant was convicted and sentenced. *Id.* ¶¶ 7-13. In argument, the State highlighted the defendant's criminal history, the circumstance surrounding the offense, and defendant's continued denial of any involvement despite his fingerprints at the scene. *Id.* ¶ 14. The State argued, in part, a life sentence was necessary to deter others from going on similar crime sprees. *Id.* The defense requested the court to consider the defendant's rehabilitation and the fact he was a " 'very young man.' " *Id.* ¶ 15. The defense requested the court consider alternatives to life in prison " 'to give this young man an opportunity.' " *Id.* In imposing the sentence, the court stated as follows*:*

> " 'In this sentence the [c]ourt has considered the factors enumerated in the Criminal Code as factors in [m]itigation and factors in [a]ggravation. The [c]ourt does not find any factors in [m]itigation. There are many factors in [a]ggravation. The [c]ourt has

considered the evidence presented at the trial in this cause. The [c]ourt has considered the presentence investigation. The [c]ourt has considered the evidence presented at this hearing today and the arguments of counsel. And the [c]ourt believes that this [d]efendant cannot be rehabilitated, and that it is important that society be protected from this [d]efendant.

It is therefore the sentence of this [c]ourt and you are hereby sentenced, Mr. Holman, to the Department of Corrections for the rest of your natural life.' " *Id.* ¶ 17.

¶ 59 On appeal, the central issue before the supreme court was whether the defendant was entitled to a new sentencing hearing under *Miller*. *Id.* ¶ 1. The court first considered whether *Miller* applies to discretionary life sentences. *Id.* ¶¶ 33-40. After reviewing *Miller*, *Montgomery*, and persuasive case law addressing *Miller* and *Montgomery*, the supreme court found "*Miller* applies to discretionary sentences of life without parole for juvenile defendants." *Id.* ¶ 40. The court then considered what it meant to apply *Miller*. *Id.* ¶¶ 41-47. After reviewing the emerging body of post-*Miller* case law, its own precedent, and recently enacted, statutory sentencing guidelines requiring trial courts to consider factors addressed in *Miller* when sentencing juvenile defendants, the supreme court held as follows:

"Under *Miller* and *Montgomery*, a juvenile defendant may be sentenced to life imprisonment without parole, but only if the trial court determines that the defendant's conduct showed irretrievable depravity, permanent incorrigibility, or irreparable corruption beyond the possibility of rehabilitation. The court may make that decision only after considering the defendant's youth and its attendant characteristics. Those characteristics include, but are not limited to, the following factors: (1) the juvenile defendant's chronological age at the time of the offense and any evidence of his particular immaturity, impetuosity, and failure to appreciate risks and consequences; (2) the juvenile defendant's family and home environment; (3) the juvenile defendant's degree of participation in the homicide and any evidence of familial or peer pressures that may have affected him; (4) the juvenile defendant's incompetence, including his inability to deal with police officers or prosecutors and his incapacity to assist his own attorneys; and (5) the juvenile defendant's prospects for rehabilitation." *Id.* ¶ 46.

The supreme court further held, when a reviewing court is required to revisit a juvenile defendant's life sentence to see if it is constitutionally permissible under *Miller*, "the only evidence that matters is evidence of the defendant's youth and its attendant characteristics *at the time of sentencing*." (Emphasis added.) *Id.* ¶ 47. That is, the reviewing court's inquiry will be "backwards-looking" based on the "cold record." *Id.*

¶ 60 After holding *Miller* applied to discretionary life sentences for juvenile defendants and determining what it meant to apply *Miller*, the supreme court turned to the cold record to determine if the trial court in that case sufficiently considered the defendant's youth and its attendant characteristics when rendering a sentence. *Id.* ¶¶ 48-50. The supreme court noted the trial court explicitly stated it considered the trial evidence, the PSI, and the evidence and arguments from the sentencing hearing. *Id.* ¶ 48. The supreme court then reviewed that evidence and those arguments as it related to the defendant's youth and its attendant characteristics. *Id.* Based on its review, the supreme court concluded the defendant's sentence passed constitutional muster under *Miller*. *Id.* ¶ 50.

¶ 61 In accordance with *Holman*, we turn to the "cold record" in this case to determine whether the trial court sufficiently considered defendant's youth and its attendant characteristics prior

to sentencing him to life in prison. See *id.* ¶ 47. In announcing defendant's sentence, the trial court explicitly stated it considered the evidence offered at trial, the PSI and its addendum, and the evidence offered by the State and defendant at the sentencing hearing. The court considered the fact defendant was 17 years old at the time of the offense. In fact, the court stated it struggled with defendant's age the most, as it believed juveniles were entitled to learn from their mistakes. The PSI and its addendum provided some insight into defendant's mentality, and both the State and the defense highlighted his mentality in their arguments at the sentencing hearing. The sentencing judge presided over the matter throughout the trial court proceedings and was provided evidence indicating defendant had a full scale IQ of 75 when he was tested at 8 and 12 years of age, individuals previously described him as intelligent, and he plotted an in-depth escape plan while incarcerated and awaiting trial. The evidence did not depict defendant as immature, impetuous, or unaware of risks. The PSI provided information concerning defendant's family and home environment. Defendant faced parental neglect and physical abuse. Defendant's father was largely responsible for caring for defendant when he was not in placement in Iowa. Defendant's father, with whom defendant was admittedly close, expressed his concern at the sentencing hearing regarding defendant's possible release, as he believed imprisonment was necessary to prevent defendant from hurting someone again. The court was aware of the particularly heinous circumstances of the murder, which did not include any element of familial or peer pressures. The evidence did not demonstrate defendant was incompetent and could not communicate with police officers or prosecutors or assist his own attorney. The court was presented with significant evidence outlining a history of deviant conduct as well as the multiple attempts to rehabilitate defendant. The evidence was such that the court could confidently conclude defendant was beyond rehabilitation. Based on our review of the record, we find the trial court considered the type of evidence *Miller* requires and the *Holman* factors were sufficiently addressed.

¶ 62    In our initial, now-vacated opinion, we found the trial court's reasoning conveyed its belief defendant was "one of the *rarest* of juvenile offenders whose crime showed a life sentence is appropriate." (Emphasis in original.) *Stafford*, 2016 IL App (4th) 140309, ¶ 52; see *Montgomery*, 577 U.S. at ___, 136 S. Ct. at 734 ("*Miller* did bar life without parole *** for all but the rarest of juvenile offenders, those whose crimes reflect permanent incorrigibility."); *cf.* *People v. Nieto*, 2016 IL App (1st) 121604, ¶ 55, 52 N.E.3d 442 ("[T]he trial court's findings do not imply that it believed defendant was the *rarest* of juveniles whose crime showed that he was permanently incorrigible." (Emphasis in original.)). We reaffirm that finding. The trial court's reasoning conveys a finding of permanent incorrigibility.

¶ 63    Defendant suggests, for the first time in his supplemental brief, his sentence violates the eighth amendment because the trial court improperly considered (1) the deterrent effect of his sentence and (2) his criminality where he never faced any charges related to his alleged sexual contact and physical aggression with his younger brothers. Defendant does not address, however, the fact the trial court had a duty to consider statutory aggravating factors while exercising its discretion to impose a more severe prison term. See 730 ILCS 5/5-5-3.2(a) (West 2002). As the State asserts, defendant has failed to persuade us the trial court's consideration of these factors violates the eighth amendment.

¶ 64    Based on the record before us, we find defendant's sentence to life in prison passes constitutional muster.

## D. Categorical Ban

As a final matter, defendant requests in his supplemental brief this court adopt a categorical ban on life sentences for juveniles. We decline to do so. In *Holman*, the supreme court refused to adopt such a rule, noting "the justices of the United States Supreme Court have so far declared that [such sentences] may be [constitutional], provided the trial court complies with *Miller*." *Holman*, 2017 IL 120655, ¶ 51. As indicated by our supreme court, "[w]hether or not discretionary life sentences for juveniles are advisable is a question for legislators." *Id.*

## III. CONCLUSION

We affirm the trial court's dismissal of defendant's postconviction petition. As part of our judgment, we award the State its $75 statutory assessment as costs of this appeal. 55 ILCS 5/4-2002(a) (West 2014).

Affirmed.