NOTICE
This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

2020 IL App (4th) 140778-UB

NO. 4-14-0778

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
July 14, 2020
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Macon County |
| DELMONT E. THOMAS JR., | ) | No. 11CF1736 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Thomas E. Griffith Jr, |
| | ) | Judge Presiding. |

JUSTICE TURNER delivered the judgment of the court.
Justices Knecht and Harris concurred in the judgment.

**ORDER**

¶ 1   *Held*:   Suppression of defendant's statements to the police is not warranted. However, defendant's *de facto* life sentence of 55 years' imprisonment violates the eighth amendment, and he is entitled to a new sentencing hearing.

¶ 2   In December 2011, the State charged defendant, Delmont E. Thomas Jr., who was 16 years old at the time, by information with three counts of first degree murder (720 ILCS 5/9-1(a)(1), (a)(2) (West 2010)) for the death of Brian Carney. Before trial, defendant filed a motion to suppress, contending his statements made during a custodial interview by Detective Charles Hendricks should be suppressed because he was not afforded his right to have a parent or legal guardian present in the interview. In December 2013, the Macon County circuit court denied defendant's motion to suppress. After a May 2014 trial, a jury found defendant guilty of first degree murder and also concluded defendant personally discharged a firearm that proximately caused death to another person. Defendant filed a posttrial motion raising numerous

contentions of error. At a joint July 2014 hearing, the court denied defendant's posttrial motion and sentenced him to 55 years' imprisonment. Defendant filed a motion to reconsider his sentence, which the court denied in August 2014.

¶ 3    On appeal, defendant argued (1) he did not knowingly and intelligently waive his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966); (2) his statements should have been suppressed because an unrepresented juvenile cannot intelligently waive his *Miranda* rights; (3) he was entitled to resentencing pursuant to section 5-4.5-105(a) of the Unified Code of Corrections (Unified Code) (730 ILCS 5/5-4.5-105(a) (West Supp. 2015)); and (4) his 55-year sentence was a *de facto* life sentence that violated the eighth amendment of the United States Constitution (U.S. Const., amend. VIII) and the proportionate penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 11). In February 2017, this court affirmed the circuit court's judgment. Defendant filed a petition for leave to appeal to the Illinois Supreme Court. In March 2020, the supreme court denied defendant's petition; however, in the exercise of its supervisory authority, it directed this court to vacate our judgment and reconsider defendant's eighth amendment argument. *People v. Thomas*, No. 122218 (Ill. Mar. 25, 2020) (nonprecedential supervisory order on denial of petition for leave to appeal). Specifically, we are to consider the effect of the supreme court's opinions in *People v. Buffer*, 2019 IL 122327, 137 N.E.3d 763, and *People v. Holman*, 2017 IL 120655, 91 N.E.3d 849, on the issue of whether defendant's sentence constitutes a *de facto* life sentence in violation of the eighth amendment and *Miller v. Alabama*, 567 U.S. 460 (2012). *Thomas*, No. 122218 (Ill. Mar. 25, 2020). Both parties have filed supplemental briefs addressing the supreme court's directive. We now vacate our original judgment, reverse defendant's 55-year sentence, affirm the circuit court's judgment in all other respects, and remand for a new sentencing hearing.

¶ 4                                    I. BACKGROUND

¶ 5         On December 14, 2011, defendant, who was sitting in the backseat of Carney's car, shot Carney in the head as Carney drove the car around Decatur. Defendant was accompanied by two friends, T.J. and Byron A., also juveniles. Witnesses saw the three juveniles run from the vehicle after the shots were fired. Police saw defendant walking near the area and began to approach him. Defendant ran from the police but was eventually caught and taken to police headquarters at approximately 3:30 p.m.

¶ 6         Detective Hendricks began defendant's interview, which was audio and video recorded, at approximately 4:10 p.m. The following is a summary of that recording. Detective Hendricks began by asking defendant general questions. Within two minutes, defendant asked if the police had contacted his aunt. Detective Hendricks said he did not know. Defendant told Detective Hendricks he "stayed with" his aunt and grandma, and they better "make it quick" because his aunt had someplace to be. Detective Hendricks swabbed defendant's hands and left the room.

¶ 7         Detective Hendricks again entered the room at approximately 5:20 p.m. with Detective James Wrigley, who was a youth officer. Detective Wrigley told defendant he had tried to contact his mother but was unsuccessful. Detective Wrigley explained to defendant he was there to "look out" for his rights. Detective Hendricks said he was going to read defendant his rights and Detective Wrigley would explain them "a little further." After Detective Hendricks read defendant's rights from the preprinted form, Detective Wrigley told defendant he did not have to talk if he did not want to. Detective Wrigley said, "Anything you tell him, he is going to tell a judge." Detective Wrigley asked defendant if he knew what an attorney was, and defendant responded it was "like a lawyer." Detective Wrigley explained an attorney is the same

as a lawyer and defendant could have an attorney there while he spoke with Detective Hendricks. Detective Wrigley also noted defendant could have an attorney appointed if he did not have money to hire one. Detective Wrigley asked if he understood, and defendant said he did. Detective Wrigley also asked if defendant had any questions about any of it, and defendant indicated he did not.

¶ 8 Detective Hendricks told defendant to initial "all these little lines here" if he understood them. Defendant can be seen writing on the paper. Detective Hendricks points to one more spot and tells defendant to "initial that one," and defendant writes again. Detective Hendricks said, "Sign it right here indicating you understand this form." Defendant then signed the form. Detective Wrigley then told defendant he would be "in and out" but he was there to "look out" for him. He told defendant that, if he had any questions, he should stop Detective Hendricks and Detective Hendricks would get Detective Wrigley to explain things for him. Detective Wrigley then left the room.

¶ 9 After Detective Wrigley left, Detective Hendricks asked defendant to explain what he had done earlier in the day. Defendant said he had met two of his friends at 16th and North Streets in Decatur to "chill and smoke weed." They were walking toward Eisenhower High School when the police pulled up. Defendant said he ran from the police because he had two marijuana blunts in his possession. The police eventually caught him and brought him to the police station. After defendant's explanation, Detective Hendricks got up to leave the room, and defendant asked him if they ever contacted his aunt. At that point, defendant had been in the room for approximately an hour and a half. Hendricks responded, "I don't think they did." Defendant gave Detective Hendricks his aunt's telephone number. Detective Hendricks asked defendant if his aunt was his legal guardian. Defendant replied no but noted his aunt was one of

his "emergency callers." Detective Hendricks left the room.

¶ 10    When Detective Hendricks returned to the room, he told defendant he knew *what* happened (referencing the shooting), he just did not know *why*. Detective Hendricks explained there could be "all kinds of different scenarios," such as whether it was intentional or accidental. He then said, "Now is the time to worry about [defendant] and try to help [defendant] out." Detective Hendricks further explained this was defendant's "one chance to try to make this right." He said the detectives had been talking to the other two juveniles and the police "know exactly what happened." Detective Hendricks noted this was defendant's one chance to be honest. Detective Hendricks said, "So, what happened?" Defendant replied he had just told him what happened. Detective Hendricks then said, "That's not what the other two are saying." Detective Hendricks continued interrogating and defendant continued to deny involvement.

¶ 11    At approximately 5:50 p.m., another detective, Lieutenant Moore (his first name does not appear in the record), entered the room. Lieutenant Moore had mannerisms more aggressive than Detective Hendricks. Lieutenant Moore told defendant he knew where everyone had been sitting in the car and asked defendant, "Did you shoot this guy in the head?" Defendant said no, and Lieutenant Moore responded that was a lie. Defendant asked Lieutenant Moore why he thought that was a lie, and Lieutenant Moore stated, "I know it's a lie. I've got two other people telling me you did it. Who did? If you didn't, who did? You were there." Defendant explained the last time he was in the vehicle was at 9:15 that morning, and Lieutenant Moore interrupted him, stating defendant was in the car when the guy got shot. Defendant again began to explain the last time he was in the car was 9:15 a.m., and Lieutenant Moore said, "coincidentally, you were within two blocks of this car when the guy gets shot in the head." Defendant tried to speak, and Lieutenant Moore again interrupted. This time, Lieutenant Moore

disputed it was a coincidence defendant was in the area, stated defendant's friends were giving him up, explained he knew where everyone was sitting and the kind of gun used based on the friends' statements, declared it is time for defendant to be honest, and asked defendant if his friends were telling the truth. Defendant responded, "It's what you got right there; that's the truth right there." Lieutenant Moore then asked, "Did you shoot this guy in the head?" Defendant said he did and went on to explain why. He said Carney had threatened to call the police to report defendant and his friends had stolen Carney's car. Defendant said Carney was driving when this conversation took place, and an argument ensued. Carney reached around to try to hit defendant. Defendant reached under the driver's seat, pulled out the gun, and shot Carney in the head several times. Detective Hendricks assured defendant he did the right thing by confessing.

¶ 12          Defendant filed a motion to suppress his aforementioned recorded statement, claiming he was not afforded the right to have his parent or guardian present during Detective Hendricks's interrogation, relying primarily on *People v. Murdock*, 2012 IL 112362, ¶ 30, 979 N.E.2d 74 (explaining that, to determine voluntariness of a confession, courts look to the totality of circumstances, including certain factors relating to defendant himself and the environment). As a result, defendant claimed his statements were not voluntary.

¶ 13          At the hearing on defendant's motion to suppress, the State called Detective Wrigley, who testified, as a youth officer, his job was to ensure defendant "was being treated fairly, making sure his rights weren't being violated, [and] making sure that his needs were being met." He said he tried to contact defendant's mother but she did not answer her telephone. Detective Wrigley left a message on her voicemail, telling her defendant was in custody and asking her to contact him. Detective Wrigley further testified he was present when defendant's

*Miranda* rights were read to him and defendant acknowledged his understanding of those rights and had no questions. He said defendant had no hesitation about waiving his rights and agreeing to speak with detectives. Approximately one hour after he had left a message for defendant's mother, Detective Wrigley indicated he had received a telephone call "from a female who identified herself as Stephanette Bond," defendant's mother. She wanted to know why she had not been contacted and stated she had not received a message from Detective Wrigley. Moreover, Detective Wrigley testified Bond told him she was heading to the police station but never arrived. As far as Detective Wrigley knew, no other concerned adult arrived either.

¶ 14　　　　Detective Wrigley admitted he was not able to monitor everything from defendant's interview because he was monitoring other juveniles at the same time. Detective Wrigley testified that, approximately 11 minutes after defendant's interview began, defendant's mother called. She asked to speak with defendant, but Detective Wrigley denied her because he "couldn't verify the identity of the person on the other end of the phone." He said she would have been allowed to meet with defendant in person. Detective Wrigley was not aware of any other attempt to contact any other parent or guardian.

¶ 15　　　　Detective Hendricks testified the juvenile investigative unit was responsible for making attempts to contact a concerned adult. He was not sure what attempts were made. Detective Hendricks's 40-minute interview (cut down to exclude the times when defendant was in the interrogation room alone) was played. Detective Hendricks said nothing indicated to him defendant's statements were not voluntary. On cross-examination, Detective Hendricks admitted he and Lieutenant Moore told defendant he was lying and admitted their voices were raised during the interview.

¶ 16　　　　Defendant called Bond, his mother, as a witness. She told police she could not

get back to Decatur until after 9 p.m. because she was in Springfield and did not have her own transportation. Bond testified she told the police she would try to get someone to the station to speak with defendant. She also stated defendant dropped out of school toward the end of his junior year of high school. Moreover, Bond testified her telephone did not have the capability of leaving messages, so she disputed Detective Wrigley's testimony he had left a message for her on her telephone. She also stated she never called the police station. The police called her for the first time at approximately 6:30 p.m.

¶ 17 After considering the evidence and arguments of counsel, the circuit court stated the following:

> "The question before the Court is whether based on the totality of the circumstances the Court believes the defendant's confession was voluntary. And to get right to the point, the Court clearly believes the confession was voluntary.
>
> I think the taped interview speaks volumes. In looking at the *Murdock* factors in a number of these things each of you have pointed out, the defendant was 16, almost 17 years of age. I believe he would have been 17 in January. He was carefully Mirandized. The defendant may have dropped out of high school but he appeared to be quite intelligent and also had some talents as demonstrated on the portion that I viewed in my chambers.
>
> ***
>
> In terms of any type of mental infirmities, I certainly did not view anything on the tape. His physical condition appeared to be fine, although he had, apparently, smoked marijuana early in the day. The defendant had slept subsequent to that time and appeared to be okay on the tape.

- 8 -

If the defendant was slightly under the influence, and I can't say that he was, from looking at the tape. The Court could certainly surmise the defendant described his hobby as 'chilling,' Mr. Jones [defense counsel], and being slightly under the influence of marijuana may not have been out of the ordinary for the defendant.

There was certainly no physical abuse. There was no mental abuse. The officers did press the defendant on a couple of occasions, but not unduly so. There was no shouting. There was no fist pounding. There was no threatening. The interview was lengthy, but not unduly so. There was a Juvenile Officer initially present. He did check on the welfare of the defendant. Do you need to use the bathroom, can I get some water, *et cetera*.

Regarding the concerned adult, the *Murdock* case is very clear that that is one factor of all the factors that we've been over, for the Court to consider. It is certainly not a controlling factor. It is also significant to the Court that the officer made every attempt to contact the defendant's mother. He asked her to come down to headquarters, spoke with her on three separate occasions, and she did not come down to the headquarters.

The Court finds the greatest care was taken with the—with this defendant regarding his interview. And on that basis again, show the Motion to Suppress the Defendant's Statement is denied."

¶ 18    Prior to the start of the jury trial and in open court, defendant asked the circuit court for leave to file a subsequent or amended motion to suppress, asserting counsel had just been made aware defendant's grandmother had been present at the police station during the

interview but was not allowed to speak to defendant. The court denied leave, finding "no requirement that the police attempted try [*sic*] to contact every viable relative. And again, this motion has previously been heard. It's been ruled upon. We are not going to reopen it at this time. So, your motion to file some type of amended pleading is denied, Mr. Jones."

¶ 19 At the May 2014 jury trial, the recorded interrogation of defendant and his resulting confession were played for the jury. After considering this evidence, along with the testimony of the State's witnesses, the parties' arguments, and jury instructions, the jury found defendant guilty of first degree murder by personally discharging a firearm.

¶ 20 Defendant filed a motion for a judgment notwithstanding the verdict or, in the alternative, a new trial, alleging the circuit court erred by (1) denying his motion for a directed verdict, (2) denying him leave to reopen evidence on his motion to suppress, (3) allowing the jury to consider defendant's recorded interrogation and confession, and (4) overruling his objection to the jury watching the recorded interview during deliberation. Defendant also claimed the evidence was insufficient to find him guilty beyond a reasonable doubt.

¶ 21 On July 9, 2014, the circuit court held a joint hearing on defendant's posttrial motion and sentencing. After hearing the parties' arguments, the court denied defendant's posttrial motion. As to sentencing, the State presented a four-page presentence investigation report (PSI) and several victim statements. Defendant spoke in allocution. He stated the following:

> "I would just like to say thank you for the time and the effort you all put into
> letting me fight my case in here. Sorry for the pain I caused you all and my
> family. But today, I look at that I'm still not the bad guy in the case. I'm still
> innocent. I mean, I was there when it happened. I know what happened. There's

three other people that could tell you exactly what happened. But I ain't the

shooter. That's all I got to say."

The State recommended a prison term of 55 years, and defense counsel asked for the minimum

sentence of 45 years' imprisonment.

¶ 22    The circuit court agreed with the State and sentenced defendant to a 55-year

prison term. In explaining its sentencing determination, the court stated the following:

"Regardless of what I do, he's going to spend the majority of his life in prison due

to one more—and it's a senseless act of gun violence in this particular case.

Looking at the presentence report, again, [defendant], stands convicted of

first-degree murder. The range is 45 to 85 years. I do agree with Mr. Jones, that

the minimum sentence in this case is quite substantial. Moving on through the

presentence report, this is not [defendant]'s first contact with the law. He does

have a substantial juvenile record. Possession or possessing a stolen vehicle,

unlawful use of another weapon, residential burglary is where a juvenile

[Department of Corrections] evaluation was ordered. [Defendant], apparently, is

from a good family. He has a child. He has little education. He apparently,

according to presentence report, used cannabis and perhaps Ecstasy at times on a

daily basis. [Defendant] has no history of ever having a job. What the Court also

finds significant in this case is the Court does not believe [defendant] has shown

any remorse. [Defendant] has not accepted responsibility for his conduct. And

although I agree with you, Mr. Jones, that this was not a premeditated act, I think

it was also a very cold heartless act to engage in an argument with somebody

about a car or drugs or some such thing and then shoot them in the back of the

head four times is just a cold remorseless thing. And again, [defendant] has shown no remorse. And to be frank, I don't think he is particularly sorry regarding the whole situation. So based on those factors, I do not think a minimum sentence is appropriate. I do think the State's recommendation is appropriate and I will follow it in this particular case."

¶ 23　　　Defendant filed a motion to reconsider his sentence, asserting his sentence was excessive in light of his record and the crime for which he was convicted. At an August 14, 2014, hearing, the circuit court denied defendant's motion to reconsider his sentence.

¶ 24　　　On August 29, 2014, defendant filed a timely notice of appeal in sufficient compliance with Illinois Supreme Court Rule 606 (eff. July 1, 2017), but it only stated his sentence as the appealed judgment. On September 10, 2014, defendant timely filed an amended notice of appeal listing both his conviction and sentence. Ill. S. Ct. Rs. 606(d), 303(b)(5) (eff. July 1, 2017). Thus, we have jurisdiction under Illinois Supreme Court Rule 603 (eff. Feb. 6, 2013).

¶ 25　　　　　　　　　　　　　II. ANALYSIS

¶ 26　　　　　　　　　　　A. Waiver of *Miranda* Rights

¶ 27　　　For the first time on appeal, defendant argues he did not knowingly and intelligently waive his *Miranda* rights. Indeed, the only issue before the court on defendant's motion to suppress was whether defendant's confession was voluntary, not whether his *Miranda* waiver was valid. See *People v. Bernasco*, 138 Ill. 2d 349, 358, 562 N.E.2d 958, 962 (1990) (a distinction exists between voluntariness of a confession and a knowing and intelligent waiver of *Miranda* rights). Nevertheless, defendant contends this court should review the issue under a plain-error analysis because "the error was serious," as it involved an issue of substantial

constitutional rights. As this court has previously noted, typically, the first step in a plain-error analysis is to determine whether error occurred at all. *People v. Stutzman*, 2015 IL App (4th) 130889, ¶ 30, 38 N.E.3d 544.

¶ 28 The fifth amendment to the United States Constitution provides that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const., amend. V. Similarly, the Illinois Constitution provides "[n]o person shall be compelled in a criminal case to give evidence against himself." Ill. Const. 1970, art I, § 10. The rule set forth in *Miranda* requires suppression of statements made by a defendant in response to custodial interrogation unless police officers warn the defendant of certain rights, including the right to remain silent and the right to an attorney, and obtain a voluntary waiver of those rights. *Miranda*, 384 U.S. at 478-79.

¶ 29 A defendant validly waives *Miranda* when he (1) freely and deliberately (voluntarily) relinquishes the right, rather than through intimidation, coercion, or deception, and (2) is fully aware of both the nature of the right he is abandoning and the consequences of his decision to do so. *Moran v. Burbine*, 475 U.S. 412, 421 (1986). In determining whether a waiver is knowing and intelligent, the court must look at the specific facts and circumstances, including the defendant's background, experience, and conduct. *People v. Braggs*, 209 Ill. 2d 492, 515, 810 N.E.2d 472, 487 (2003). A defendant need not have "the ability to understand far-reaching legal and strategic effects of waiving one's rights" but must have "the ability to understand the very words used in the warnings." *Bernasco*, 138 Ill. 2d at 363, 562 N.E.2d at 964.

¶ 30 Defendant alleges his waiver of his *Miranda* rights was invalid where (1) he was denied access to a concerned adult, (2) the officers directed him to sign the waiver without first

asking if he wanted to waive his rights, and (3) his cognitive functioning was underdeveloped due to his age and affected by recent drug use. Defendant was one month from his seventeenth birthday when he was interviewed. During the interview, defendant initially denied any involvement or knowledge about the shooting, but, later in the interview, admitted he shot Carney in the head multiple times. Prior to any questioning, Detective Hendricks read defendant his *Miranda* rights, allowed the juvenile officer, Detective Wrigley, to explain the rights further, and gave defendant the rights in written form to initial next to each paragraph. Defendant did not ask for any additional explanation or give any indication he did not understand his rights.

¶ 31 However, after defendant initialed and signed the form, the detectives did not specifically ask whether defendant wanted to talk, which defendant claims is improper, resulting in an invalid waiver. Defendant contends he was "forced" to initial the last paragraph on the form which stated as follows:

> "The above rights have been read to me and by me, and I fully understand those rights. Understanding the above rights, I do agree to speak with the officer(s) interviewing me. I also understand and consent that this interview may be audio and video recorded."

¶ 32 Contrary to defendant's position, we find the recorded interview clearly indicates the detectives explained to defendant he did not have to speak with them, anything he told them would be told to a judge, and he could have an attorney present. Detective Wrigley specifically said "you don't have to talk if you don't want to," "[y]ou can have an attorney here while you are speaking with Detective Hendricks," and "[i]f you don't have money for [an attorney], they will give you one for free." Defendant indicated he understood and had no questions. He signed the form, waiving his rights, and proceeded to speak with Detective Hendricks and Lieutenant

Moore.

¶ 33       "In order to be valid, a defendant's waiver of *Miranda* rights must be knowing and intelligent, which means it must reflect an intentional relinquishment or abandonment of a known right or privilege." *In re J.M.*, 2014 IL App (5th) 120196, ¶ 24, 8 N.E.3d 1213 (citing *Braggs*, 209 Ill. 2d at 514, 810 N.E.2d at 486). The recorded interview clearly demonstrated defendant knowingly and intelligently waived his *Miranda* rights by indicating he understood the meaning of the rights and by indicating he was intentionally relinquishing or abandoning those rights. We find defendant's *Miranda* waiver was valid.

¶ 34       B. Voluntariness of Defendant's Confession

¶ 35       Defendant next contends, even if his *Miranda* waiver was valid, his confession was involuntary. He does not contend he was physically coerced into making a statement, but he contends his confession was involuntary because (1) the police prevented him from speaking to a concerned adult, (2) the juvenile officer, Detective Wrigley, played a minimal role in representing his interests, (3) Lieutenant Moore used an intimidating manner and tactics, (4) no evidence showed defendant had prior interrogation experience, and (5) defendant's cognitive function was underdeveloped at his age or adversely affected by his use of marijuana. Relying on these factors, defendant contends the circuit court erred in denying his motion to suppress his confession. Defendant's argument is unpersuasive.

¶ 36       "Where a defendant challenges the admissibility of his confession through a motion to suppress, the State has the burden of proving the confession was voluntary by a preponderance of the evidence." *Braggs*, 209 Ill. 2d at 505, 810 N.E.2d at 481 (citing 725 ILCS 5/114-11(d) (West 2000)). On review of a circuit court's ruling on the voluntariness of a confession, the court's factual findings are accorded great deference and will be reversed only if

they are against the manifest weight of the evidence. *In re G.O.*, 191 Ill. 2d 37, 50, 727 N.E.2d 1003, 1010 (2000). However, the court's ruling on the ultimate question of whether the confession was voluntary is entitled to *de novo* review. *People v. Morgan*, 197 Ill. 2d 404, 437, 758 N.E.2d 813, 832 (2001).

¶ 37        Our supreme court has addressed the voluntariness standard as follows:

> "To determine the voluntariness of a confession, courts consider the totality of the circumstances, including such factors as the defendant's age, intelligence, background, experience, education, mental capacity, and physical condition at the time of questioning. [Citation.] Other factors include the duration and legality of the detention and whether there was any physical or mental abuse by the police. [Citation.] Threats or promises made by the police may be considered physical or mental abuse. [Citation.] No single factor is dispositive, rather '[t]he test of voluntariness is whether the individual made his confession freely and voluntarily, without compulsion or inducement of any kind, or whether the individual's will was overborne at the time of the confession.' " *Murdock*, 2012 IL 112362, ¶ 30 (quoting *Morgan*, 197 Ill. 2d at 437, 758 N.E.2d at 832).

¶ 38        Defendant argues his statement is involuntary due to the factors set forth above—namely his young age, the absence of a concerned adult, his drug use, and the intimidating tactics used during the interrogation. In support of that argument, defendant presents this court with a considerable amount of information throughout his brief regarding the effects marijuana has on an individual, the underdeveloped brain of a 16-year-old, and improper police tactics used specifically against juveniles. "[G]enerally, a party may not rely on matters outside the appellate

record to support his or her position on appeal." *Kildeer-Countryside School District No. 96 v. Board of Trustees of the Teachers' Retirement System*, 2012 IL App (4th) 110843, ¶ 21, 972 N.E.2d 1286. As a result, we decline to consider matters not presented to the circuit court.

¶ 39    Regarding juveniles, the *Murdock* court explained:

"The taking of a juvenile's confession is a sensitive concern, and for this reason the greatest care must be taken to assure that the confession was not coerced or suggested. [Citation.] The confession should also not be the product of adolescent fantasy, fright, or despair. [Citation.] Illinois courts have recognized an additional factor not applicable in cases involving adults: the presence of a 'concerned adult.' [Citation.] This factor considers whether the juvenile, either before or during the interrogation, had an opportunity to consult with an adult interested in his welfare. [Citation.] In weighing this factor, courts also consider whether the police prevented the juvenile from conferring with a concerned adult and whether the police frustrated the concerned adult's attempt to confer with the juvenile. [Citation.]

However, a juvenile's confession or statement should not be suppressed merely because he was denied the opportunity to confer with a parent or other concerned adult before or during the interrogation. [Citation.] The concerned adult factor is particularly relevant in situations in which the juvenile has demonstrated trouble understanding the interrogation process, he asks to speak with a concerned adult, or the police prevent the concerned adult from speaking with him. [Citation.] The concerned adult factor is just one of the many factors to be examined when determining whether a juvenile's confession was voluntary.

- 17 -

[Citation.]" *Murdock*, 2012 IL 112362, ¶¶ 32-33.

¶ 40       Here, the circuit court relied on several factors in determining defendant's confession was voluntary. The court based its ruling on the testimony from the detectives, as well as defendant's mother. After considering the totality of the circumstances, the court found defendant was not coerced directly or indirectly. The court found the recorded interview "sp[oke] volumes." Defendant was almost 17 years old, he was "carefully Mirandized," he appeared "quite intelligent," he was "clearly from a good family," he had no obvious "mental infirmities," no obvious physical impairments, he had slept subsequent to his marijuana use that particular day, no signs of physical or mental abuse were shown, no undue pressure was utilized during interrogation, he was not threatened, the interview was "not unduly" lengthy, the youth officer was present to check on defendant's welfare, and "the greatest care was taken with *** this defendant regarding this interview." Regarding the concerned-adult factor, the court found the officer "made every attempt to contact the defendant's mother. He asked her to come down to headquarters, spoke with her on three separate occasions," yet she did not appear at the police station.

¶ 41       Given our deferential review of the circuit court's factual findings, we conclude those findings were not against the manifest weight of the evidence. Although defendant indeed requested the police contact his aunt, he nevertheless waived his *Miranda* rights, willingly agreed to speak with detectives, and, thus, by all accounts in the record, voluntarily confessed to the crime. We do not find a connection between defendant's request to have his aunt contacted and a lack of voluntariness of his confession. He seemed to be concerned only that someone in his family was advised of his whereabouts.

¶ 42       Further, in this court's opinion, the new evidence discovered by counsel that

defendant's grandmother was present at police headquarters but was denied access to defendant, would have had no effect on the circuit court's decision to deny the motion to suppress. This is so because, given the totality of the circumstances and the consideration of the other factors, the factor involving the absence of a concerned adult was not dispositive. See *People v. Gardner*, 282 Ill. App. 3d 209, 668 N.E.2d 125 (1996). In *Gardner*, the defendant's grandmother appeared at the police station during the juvenile defendant's detention and interrogation but was denied access to him. *Gardner*, 282 Ill. App. 3d at 217, 668 N.E.2d at 131. The reviewing court affirmed the circuit court's decision to admit the defendant's confession despite this evidence. *Gardner*, 282 Ill. App. 3d at 218, 668 N.E.2d at 131. The court based its decision after considering the totality of the circumstances, pointing out the fact a youth officer was present to protect the juvenile's rights. *Gardner*, 282 Ill. App. 3d at 218, 668 N.E.2d at 131. The court noted, although a parent or guardian must be notified, there is no *per se* rule that a parent or guardian be present. *Gardner*, 282 Ill. App. 3d at 218, 668 N.E.2d at 131. We agree with *Gardner* and, applying the same principles to defendant's case, conclude the grandmother's denial of access to defendant would not have affected the voluntariness of defendant's confession under the totality of the circumstances presented. Thus, the circuit court did not err by denying defendant leave to file a second motion to suppress based on the assertion the police did not allow defendant's grandmother to speak with him.

¶ 43                                C. Juvenile's Right to Representation

¶ 44        Defendant contends this court should find a presumption exists an unrepresented juvenile cannot intelligently waive his *Miranda* rights. He further contends the presumption should be irrebuttable if the police deny the juvenile's request to speak with a concerned adult. We decline to do so.

¶ 45        Our supreme court addressed and declined a similar request in *G.O.*, 191 Ill. 2d 37, 727 N.E.2d 1003.  There, the State argued the appellate court had seemingly created a *per se* rule requiring the suppression of a juvenile's confession if the juvenile was denied the ability to confer with a concerned adult before or during his interrogation.  See *G.O.*, 191 Ill. 2d at 55, 727 N.E.2d at 1013.  The supreme court agreed with the State in arguing against the appellate court's decision, finding "a juvenile's confession should not be suppressed simply because he was denied the opportunity to confer with a parent or other concerned adult before or during the interrogation."  *G.O.*, 191 Ill. 2d at 55, 727 N.E.2d at 1013.  The court found, "[w]hile not dispositive, this is one of many factors to be examined when determining whether a juvenile's confession was voluntary."  *G.O.*, 191 Ill. 2d at 55, 727 N.E.2d at 1013.  Accordingly, the supreme court explicitly declined to create a *per se* rule requiring minors to consult with a parent, guardian, or attorney before being interviewed.  *G.O.*, 191 Ill. 2d at 57, 727 N.E.2d at 1014 ("[W]e have already determined that the ability of a juvenile to consult with a concerned adult is one of many factors that courts must consider when determining whether a confession is voluntary.  However, we see no basis in the law to conclude that this single factor should be dispositive.").  Therefore, following our supreme court's guidance, we will not create a *per se* rule an unrepresented juvenile can never intelligently waive *Miranda* rights.

¶ 46                                        D. Sentencing

¶ 47        Lastly, defendant contends this case should be remanded for resentencing for one of two reasons:  (1) for the retroactive application of the newly enacted statute provided in Public Act 99-69, section 10 (eff. Jan. 1, 2016) (adding 730 ILCS 5/5-4.5-105 to the Unified Code), which took effect during the pendency of this appeal and requires a circuit court to consider special mitigating factors when sentencing juveniles or (2) because his 55-year sentence is a

- 20 -

*de facto* life sentence in contravention of the principles espoused in *Miller*. Our resolution of the *Miller* issue renders defendant's first contention moot.

¶ 48    In his supplemental brief, defendant asserts his 55-year sentence is a *de facto* life sentence that violates the eighth amendment because the circuit court did not (1) consider the attendant characteristics of juveniles in imposing the sentence and (2) did not find defendant's conduct showed irretrievable depravity, permanent incorrigibility, or irreparable corruption. The State contends defendant's *de facto* life sentence of 55 years does not violate the eighth amendment because the circuit court adequately considered mitigating factors during sentence.

¶ 49    In *Miller*, 567 U.S. at 489, the United States Supreme Court found unconstitutional a sentencing scheme that mandated life in prison without the possibility of parole for juvenile offenders (those under the age of 18), including those convicted of homicide. The *Miller* Court did not foreclose sentencing a juvenile convicted of homicide to life in prison, but it emphasized the judge or jury must have the opportunity to consider mitigating factors before imposing the harshest possible penalty on a juvenile. *Miller*, 567 U.S. at 489. The *Miller* Court explained that, before imposition of life imprisonment without the possibility of parole, a court must consider how children are different from adult offenders for purposes of sentencing and the offender's youth and attendant characteristics. *Miller*, 567 U.S. at 480, 483. Later, in *Montgomery v. Louisiana*, 577 U.S. ___, 136 S. Ct. 718, 736 (2016), the United States Supreme Court found *Miller* announced a new substantive rule of constitutional law that is retroactive on state collateral review. It also reiterated what must be considered before imposing life imprisonment without the possibility of parole on a juvenile. *Montgomery*, 577 U.S. at ____, 136 S. Ct. at 733-34. The *Montgomery* Court further emphasized life imprisonment without parole was unconstitutional "for all but the rarest of juvenile offenders, those whose crimes

- 21 -

reflect permanent incorrigibility." *Montgomery*, 577 U.S. at \_\_\_\_, 136 S. Ct. at 734.

¶ 50    In *Buffer*, 2019 IL 122327, the Illinois Supreme Court reviewed the United States Supreme Court's eighth amendment jurisprudence related to juveniles, including *Miller* and *Montgomery*. The supreme court held that, for a defendant to succeed on a claim based on *Miller* and its progeny, the defendant, who committed the offense while a juvenile, must show the following: "(1) the defendant was subject to a life sentence, mandatory or discretionary, natural or *de facto*, and (2) the sentencing court failed to consider youth and its attendant characteristics in imposing the sentence." *Buffer*, 2019 IL 122327, ¶ 27. The *Buffer* court then addressed what specific term of years amounts to a *de facto* natural life sentence. After reviewing recent enactments by the General Assembly, the supreme court concluded a prison term of 40 years is long enough to be considered a *de facto* natural life sentence. *Buffer*, 2019 IL 122327, ¶ 40. Considering the facts before it, the *Buffer* court found both the defendant's 50-year sentence was a *de facto* natural life sentence and the circuit court failed to consider the defendant's youth and its attendant characteristics in imposing that sentence. *Buffer*, 2019 IL 122327, ¶ 42. Thus, the supreme court held the defendant's sentence violated the eighth amendment and vacatur of the unconstitutional sentence was warranted. *Buffer*, 2019 IL 122327, ¶ 42. As to the proper remedy, it found that, "[b]ased on the particular issue raised in this appeal and in the interests of judicial economy," the defendant's cause should be remanded for a new sentencing hearing rather than further postconviction proceedings. *Buffer*, 2019 IL 122327, ¶ 47. Additionally, the supreme court held that, on remand, the circuit court should sentence the defendant under the scheme prescribed by section 5-4.5-105 of the Unified Code (730 ILCS 5/5-4.5-105 (West 2016)). *Buffer*, 2019 IL 122327, ¶ 47.

¶ 51    Here, the parties agree defendant's 55-year sentence is a *de facto* life sentence

under *Buffer*. However, they disagree on whether the circuit court considered the attendant characteristics of juveniles in imposing the sentence and found defendant's conduct showed irretrievable depravity, permanent incorrigibility, or irreparable corruption.

¶ 52    In *Holman*, 2017 IL 120655, the supreme court explained how to apply *Miller* to juvenile sentences. It stated the following:

> "Under *Miller* and *Montgomery*, a juvenile defendant may be sentenced to life imprisonment without parole, but only if the trial court determines that the defendant's conduct showed irretrievable depravity, permanent incorrigibility, or irreparable corruption beyond the possibility of rehabilitation. The court may make that decision only after considering the defendant's youth and its attendant characteristics. Those characteristics include, but are not limited to, the following factors: (1) the juvenile defendant's chronological age at the time of the offense and any evidence of his particular immaturity, impetuosity, and failure to appreciate risks and consequences; (2) the juvenile defendant's family and home environment; (3) the juvenile defendant's degree of participation in the homicide and any evidence of familial or peer pressures that may have affected him; (4) the juvenile defendant's incompetence, including his inability to deal with police officers or prosecutors and his incapacity to assist his own attorneys; and (5) the juvenile defendant's prospects for rehabilitation. [Citation.]" *Holman*, 2017 IL 120655, ¶ 46.

Further, the court explained:

> "In revisiting a juvenile defendant's life without parole sentence, the only evidence that matters is evidence of the defendant's youth and its attendant

- 23 -

characteristics at the time of sentencing. Whether such evidence exists depends upon the state of the record in each case. A court revisiting a discretionary sentence of life without parole must look at the cold record to determine if the trial court considered such evidence at the defendant's original sentencing hearing." *Holman*, 2017 IL 120655, ¶ 47.

¶ 53 Additionally, the *Holman* court noted "consideration of the *Miller* factors" was consistent with section 5-4.5-105 of the Unified Code (730 ILCS 5/5-4.5-105 (West 2016)), which was enacted after *Miller* and requires a sentencing court "to consider factors taken from the Supreme Court's list" prior to sentencing a juvenile offender. *Holman*, 2017 IL 120655, ¶ 45. Those factors include the following:

"(1) the person's age, impetuosity, and level of maturity at the time of the offense, including the ability to consider risks and consequences of behavior, and the presence of cognitive or developmental disability, or both, if any;

(2) whether the person was subjected to outside pressure, including peer pressure, familial pressure, or negative influences;

(3) the person's family, home environment, educational and social background, including any history of parental neglect, physical abuse, or other childhood trauma;

(4) the person's potential for rehabilitation or evidence of rehabilitation, or both;

(5) the circumstances of the offense;

(6) the person's degree of participation and specific role in the offense, including the level of planning by the defendant before the offense;

(7) whether the person was able to meaningfully participate in his or her defense;

(8) the person's prior juvenile or criminal history; and

(9) any other information the court finds relevant and reliable, including an expression of remorse, if appropriate. However, if the person, on advice of counsel chooses not to make a statement, the court shall not consider a lack of an expression of remorse as an aggravating factor." 730 ILCS 5/5-4.5-105(a) (West 2018).

¶ 54        On the facts before it, the *Holman* court held the "defendant's sentence passe[d] constitutional muster under *Miller*." *Holman*, 2017 IL 120655, ¶ 50. The supreme court examined the cold record to determine if the circuit court considered the *Miller* factors. *Holman*, 2017 IL 120655, ¶ 47. It noted the circuit court was aware of the defendant's young age, which was highlighted by both the prosecutor and the defense attorney at the sentencing hearing. *Holman*, 2017 IL 120655, ¶ 48. Moreover, "[t]he PSI and the psychological reports provided some insight into [defendant's] mentality but did not depict him as immature, impetuous, or unaware of risks." *Holman*, 2017 IL 120655, ¶ 48. However, the PSI did indicate the defendant was susceptible to peer pressure and had low intelligence, but no evidence was presented he was incompetent or could not communicate. *Holman*, 2017 IL 120655, ¶ 48. Additionally, the defendant had a close relationship with his mother and siblings. *Holman*, 2017 IL 120655, ¶ 48. As to the defendant's involvement in the crime, the trial evidence showed some dispute between the defendant and his codefendant about who shot the victim, but both were intimately involved with the offense. *Holman*, 2017 IL 120655, ¶ 48. The defendant had also been convicted of two other murders and an attempt (murder). *Holman*, 2017 IL 120655, ¶ 48. The circuit court found

"that the defendant's conduct placed him beyond rehabilitation," and it sentenced him to life in prison without parole. *Holman*, 2017 IL 120655, ¶ 50.

¶ 55        Applying the *Holman* decision, this court reviewed a *de facto* life sentence for a defendant, who was 16 years old at the time of the offense, in *People v. Murphy*, 2019 IL App (4th) 170646. There, we concluded the defendant's 55-year sentence violated the eighth amendment because the circuit court's finding the defendant possessed rehabilitative potential "contravene[d] any conclusion [the] defendant was permanently incorrigible or irretrievably depraved[.]" *Murphy*, 2019 IL App (4th) 170646, ¶ 48.

¶ 56        Also, in *People v. Harvey*, 2019 IL App (1st) 153581, ¶ 13, 141 N.E.3d 316, the reviewing court found a *de facto* life sentence for a defendant, who was 16 years old at the time of the offense, violated the eighth amendment. The *Harvey* court concluded the circuit court's "mere awareness" of the defendant's age and its consideration of the PSI did not provide evidence the court specifically considered the defendant's youth and its attendant characteristics. *Harvey*, 2019 IL App (1st) 153581, ¶ 13. Additionally, it noted "the trial court did not discuss [the] defendant's prospects for rehabilitation." *Harvey*, 2019 IL App (1st) 153581, ¶ 12.

¶ 57        In *People v. Stafford*, 2018 IL App (4th) 140309-B, ¶ 64, 107 N.E.3d 968, this court reviewed a sentence of natural life under *Holman* for a defendant, who was 17 years old at the time offense, and concluded the sentence was constitutional. There, the circuit court was presented with significant evidence outlining a history of deviant conduct and multiple attempts to rehabilitate the defendant. *Stafford*, 2018 IL App (4th) 140309-B, ¶ 61. With such evidence, we noted the circuit court could confidently conclude the defendant was beyond rehabilitation. *Stafford*, 2018 IL App (4th) 140309-B, ¶ 61. Based on our review of the record, we found the circuit court considered the type of evidence required by *Miller* and the *Holman* factors were

sufficiently addressed. *Stafford*, 2018 IL App (4th) 140309-B, ¶ 61. Moreover, we reaffirmed our finding the circuit court's reasoning conveyed its belief defendant was " 'one of the *rarest* of juvenile offenders whose crime showed a life sentence is appropriate.' " (Emphasis in original.) *Stafford*, 2018 IL App (4th) 140309-B, ¶ 62 (quoting *People v. Stafford*, 2016 IL App (4th) 140309, ¶ 52, 61 N.E.3d 1058).

¶ 58        In this case, the circuit court did consider some of the factors set forth in *Holman*. The court went through the PSI and noted things which could be considered mitigating circumstances, such as defendant was a "young man," came "from a good family," was a father, and "ha[d] little education." The court also made findings of aggravating circumstances, such as defendant's "substantial juvenile record," his lack of remorse, the fact he had "not accepted responsibility for his conduct," and the fact it was "a very cold heartless act." However, as in *Harvey*, the court never addressed defendant's rehabilitative potential. Moreover, unlike the defendants in *Holman* and *Stafford*, defendant did not have an extensive history of violent acts. The record also does not show any considerable attempts at rehabilitation. Thus, the fact the court did not address defendant's rehabilitative potential is significant in this case. Also, defendant was in the car with two of his friends at the time of the shooting and the issue of peer pressure may also need to be addressed in this case. Thus, we find the circuit court did not sufficiently address all the considerations required by *Miller* and *Holman*. Additionally, given the circuit court's failure to address defendant's rehabilitative potential and the lack of evidence on that factor, we find the record does not show the circuit court found defendant was irretrievably depraved, permanently incorrigible, or irreparably corrupt beyond the possibility of rehabilitation.

¶ 59        Accordingly, we reverse defendant's 55-year prison sentence and remand the

cause for a new sentencing hearing under the scheme prescribed by section 5-4.5-105 of the

Unified Code (730 ILCS 5/5-4.5-105 (West 2018)).

¶ 60                                    III. CONCLUSION

¶ 61         For the reasons stated, we reverse defendant's 55-year sentence, affirm the Macon

County circuit court's judgment in all other respects, and remand the cause for a new sentencing

hearing.

¶ 62         Affirmed in part and reversed in part; cause remanded with directions.